UNITED STATES GYPSUM CO.

v.

SCHIAVO BROTHERS, INC.

Civ. A. No. 74–3165.

United States District Court,
E. D. Pennsylvania.

May 1, 1978.

Michael Baylson, Duane, Morris & Heckscher, Philadelphia, Pa., for plaintiff.

John Elliott, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

FOGEL, District Judge.

## I. INTRODUCTORY STATEMENT:

Good name in man and woman, dear my Lord,

Is the immediate jewel of their souls;
*Who steals my purse steals trash; 'tis something, nothing*:
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed.[1]
(Emphasis supplied.)

---

[1] Othello, William Shakespeare (1604)—speech of Iago Act III, Scene III—Lines 155–161—Edition of 1936, edited by George Lyman Kittredge.

The subject of this lawsuit concerns no one's good name; it does concern trash. While the actors in this saga do not quite reach the dramatic heights of an Othello or an Iago, the bitterness generated by this dispute between landlord and tenant with respect to the responsibility for cleaning up industrial land has produced quite a scenario (and has also provided us with more than one sideshow). It is the consequence of a long standing business relationship gone sour.

Plaintiff, United States Gypsum Company (USG), was the lessor of a tract of land in Southwest Philadelphia under a lease agreement which began in 1966 and ended in 1974. USG seeks to recover from the lessee under that lease, Schiavo Brothers, Inc. (Schiavo), costs incurred by USG in clearing a large amount of trash and debris left on the land by Schiavo at the termination of the lease. The cause of this accumulation of debris was the use to which the property was put; Schiavo, pursuant to the terms of the lease, sublet a substantial portion of the leasehold premises to junk car dealers. When these dealers vacated the property in 1974, they neglected to take with them a substantial amount of the remains of their operations, specifically tires and car seats. Additionally, the property accumulated, during the course of the lease, a large amount of debris which was the result of illegal dumping by third persons.

When the lease was terminated and Schiavo surrendered the land to USG, Schiavo denied any duty to clear the debris from the land. It based its position on the terms of the 1966 lease, which made no provision for the cleanup of the property at termination; Schiavo contends that such a duty cannot be implied.

Plaintiff contends that Schiavo is in breach both of its express duty to surrender peaceably the property, and its implied duty, as lessee, to return the property in substantially the same condition which existed at the inception of the lease, reasonable wear and tear excepted.

Schiavo also filed a counterclaim against USG, pursuant to Fed.R.Civ.P. 13; this counterclaim arises from another lease between USG as lessor and Schiavo as lessee. This lease was signed in 1970, and concerned a tract of land adjacent to the property which was the subject of the 1966 lease between the parties. Schiavo alleges that USG fraudulently misled Schiavo with respect to the duration of this lease; it contends that it expended a large sum of revenue in the purchase of new equipment, and in improving a road leading to the property in reliance on USG's misrepresentation; Schiavo claims USG then wrongfully terminated the lease, causing damage to it.

The trial, which was non-jury, took ten days, eight of which were devoted to trial of the main claim. Following the trial, the parties submitted extensive briefs and requests for findings of fact and conclusions of law. Thorough oral argument was heard. We are now prepared to issue our Findings of Fact and Conclusions of Law, pursuant to Fed.R.Civ.P. 52(a).

*With respect to the main claim, we find that plaintiff has failed to prove, by a preponderance of the evidence, that Schiavo is in breach of either an express covenant to peaceably surrender the property, or an implied covenant to return the land in substantially the same condition as existed at the inception of the lease, (reasonable wear and tear excepted). With respect to the counterclaim, we find that Schiavo has also failed to meet its burden of proof.*

## II. FINDINGS OF FACT—MAIN CLAIM:

We will present our findings of fact, made pursuant to Fed.R.Civ.P. 52(a), in narrative form:

### A. Introduction:

USG is a corporation engaged in the manufacture of gypsum building products; it is incorporated in Delaware, and its principal place of business is in Chicago, Illinois. Schiavo is in the business of waste disposal; its state of incorporation is Pennsylvania, and its principal place of business is located in Philadelphia. In January, 1966, the parties entered into a leasehold agreement for

a tract of land located in Southwest Philadelphia which was owned by USG [2]; it is that lease which is the center of the dispute before us.

The leasehold property consisted of approximately 26 acres of territory, divided into two areas: Area A comprised slightly more than 23 of these acres, while Area B accounted for the remaining two-plus acres.[3] This property is adjacent to Essington Avenue, and covers both sides of 67th Street in Philadelphia, an industrial area in Southwest Philadelphia which is near the Philadelphia International Airport and consists of much undeveloped land.

### B. Pre-1966 Background:

The primary benefit which USG derived, over the years, from its ownership of the leasehold property, was the disposal of the company's waste through the operation of a landfill on the property. USG has a manufacturing plant located in Philadelphia, which produces a great amount of waste material that must be eliminated; USG's ownership of the leasehold property provided the necessary means for this disposal. Prior to 1959, the property was entirely below grade, and was, therefore, suitable for a landfill operation. In summary form, this operation consists of dumping successive layers of waste in trenches dug on the land, and covering each layer with a layer of dirt; this procedure is continued until the land is brought up to grade. In this fashion, a properly operated landfill can last for many years.

USG began to use the leasehold property for waste disposal approximately in 1959; USG leased Area B to a Mr. Archer, a waste hauler, who was to conduct a landfill operation on the property, using primarily USG waste material to bring the land up to grade; it took approximately one year to accomplish this. At that time, in 1960, Area B was leased by USG to a Mr. Spence and a Mr. Montgomery for the purpose of operating an automobile junk dealership on the property.

In the meantime, while Area B was being brought up to grade, USG also began to have its waste dumped on another part of the leasehold property; it leased a small section of Area A, which has been designated as Area F (this section has roughly the shape of a finger), to a Mr. Neely; Area F covers approximately 718 feet along Essington Avenue, to a depth of about 100 feet. Mr. Neely agreed to conduct a landfill on Area F, again using primarily waste material of the lessor, USG. When Area F was brought up to grade (within about a year), Neely began to operate a used truck business on the property, a use specifically permitted under the terms of his lease with USG.

In 1961, Neely had a heart attack, and he assigned his rights and obligations under the lease for Area F to Joseph Adiletto, who continued to conduct a used truck business on the land. Soon, however, Adiletto went beyond the uses permitted under the lease, and not only began to deal in automobile scrap himself, but also to sublet a part of Area F to two automobile junk dealers. When USG became aware of Adiletto's activities, it did not order removal of the junk car dealer operation, (Spence and Montgomery were already operating a junk car dealership on Area B), but increased the rental which Adiletto was to pay under the lease. Thus, the junk car dealers continued to occupy Area F.

By 1963, however, USG had become very unhappy with the manner in which Adiletto supervised the junk car dealers. The junk cars had expanded beyond the boundaries of Area F, and were constantly sprawling onto Essington Avenue, a public thoroughfare. In addition, the property was generally in an unkempt condition, with junk scrap and debris spread throughout the area; this generally poor maintenance of the property had prompted frequent com-

**2.** The lease agreement was dated January 1, 1966.

**3.** Trial Exhibit P–1, which was admitted into evidence, is a survey of a portion of the City of Philadelphia, including the leasehold property. The parties have stipulated to the accuracy of this document.

plaints from the City of Philadelphia. For these reasons, USG cancelled the lease with Adiletto in 1963.

Throughout this period, defendant Schiavo had been carrying on a waste haulage and landfill operation on a parcel of land which it owned, and which was adjacent to the USG property. The real estate business relationship between plaintiff and defendant began in 1963 after USG had terminated the Adiletto lease. Area F was then leased to Schiavo by USG; [4] USG believed that Schiavo would exercise more aggressive, and therefore, more effective supervision over the junk car dealers, and thus not only keep them within the confines of their areas, but also police them so that junk cars would not be placed on Essington Avenue.

The natural expansion of junk car dealers beyond their boundaries seems, however, to be an inevitable occurrence, and the junk car sublessees gradually began to encroach on Area A, beyond Area F. Rather than force the dealers back onto their property, seemingly a fanciful idea at best, USG agreed to lease to Schiavo a further part of Area A (beyond Area F), encompassing in part the land onto which the junk dealers had expanded. This area, the subject of a second 1963 lease,[5] covered approximately 200 feet along Essington Avenue, to a depth of approximately 100 feet. Thus, after the signing of the second lease agreement, Schiavo had under lease from USG a section of Area A (encompassing Area F), extending a little more than 900 feet along Essington Avenue, to a depth of about 100 feet.

After the unhappy experience with Adiletto, USG had been somewhat wary of continuing to allow junk car dealers on the property; USG leased to Schiavo hoping that defendant would keep the property in better condition. While there is conflicting evidence on the extent to which this was accomplished, it is at least clear that Schiavo maintained the land in better condition than had Adiletto. Nevertheless, the junk

car dealers were an extremely difficult group to control; Michael Schiavo, who was the president of Schiavo Brothers, Inc. from 1962 to 1968, would periodically instruct the junk car dealers to clean up their properties if the land had become too messy, and he would demand that they keep their goods within their particular boundaries. It was, however, a constant struggle.

Whatever the degree of success of Schiavo at the supervision of the subtenants, the evidence establishes that the City of Philadelphia did not want the junk car dealers on the land. The junk car operations produced recurrent fire calls which had to be answered by the City; they also produced several air pollution violations, the result of open burning on the land. Thus, in February, 1965, the City recommenced to USG that the Schiavo lease be extended only on condition that the junk car dealers be removed from the land, and that a lease term be added which would specifically forbid the lessee from subletting to junk car dealers.

USG, however, was advised by C. J. Mitchell Co., Inc. (Mitchell), its real estate agent with respect to the leasehold property, that Schiavo was making "a real effort to compel his tenants to operate according to the terms of the lease agreement." (Trial Exhibit D–94.) Mitchell counselled USG to oppose the City's attempts to eliminate the junk car dealers; this advice was followed by USG, culminating in the lease of January 1, 1966, which is now before us for interpretation.[6]

### C. The 1966 Lease:

Before introducing the terms of the 1966 lease, it is necessary to summarize the basic nature of the business relationship between USG and Schiavo. We have noted that Schiavo, in leasing Area F and another part of Area A, acted as master tenant in trying to control the junk car sublessees. It is important to recognize, however, that this was merely a sideline operation for Schiavo;

---

**4.** The date of this lease agreement was January 18, 1963.

**5.** This second 1963 lease was dated August 15, 1963.

**6.** The 1966 lease was admitted as Trial Exhibit P–15.

its main business was waste haulage. Because of USG's need to dispose of its waste, and Schiavo's obvious interest in generating revenue through the hauling of waste, the parties were able to maintain a healthy, symbiotic relationship. As we have noted, the leasehold property, owned by USG, was suited for a landfill operation because it was below grade; however, USG needed a dumping permit to be able to dispose of its waste on the property; Schiavo had such a permit. Similarly, Schiavo needed a landfill area into which it could dispose of the waste it hauled; it could not, however, run a landfill operation without a City permit; USG possessed this permit. In addition, USG desired to have the land brought up to grade, since this would increase its value; it was also to USG's benefit to have a tenant occupying the property, because vacant land would be highly susceptible to the illegal dumping of waste by outsiders (a phenomenon known as "fugitive dumping" or "short dumping"). So our Othello and Iago did indeed start off well.

In recognition of their mutual needs, USG and Schiavo, in January, 1966, entered into two separate contracts: a waste haulage agreement and a lease; it is only the latter document with which we are concerned in the matter before us. We note that this lease cannot be characterized in any sense as an adhesion contract; both parties were represented by counsel in the negotiation of its terms.

The leasehold property encompassed all of Areas A and B (including, of course, Area F, the subject of the first 1963 lease, and the other portion of Area A which had been the subject of the second 1963 lease). The 1966 lease superseded and terminated both 1963 leases between the parties.[7] USG terminated its lease with Spence and Montgomery which covered this property.

Spence and Montgomery had, since the inception of its tenancy in 1960, been using the property for the operation of a junk car dealership, similar to the use to which Schiavo's subtenants had put Area F and the other portion of Area A. The remainder of the leasehold area, on Area A, was still below grade and suitable for landfilling. Thus, while the 1966 lease was designed primarily to memorialize Schiavo's future operation of a landfill on the property, the lease nevertheless encompassed, in part, areas which had already been brought up to grade, and which were being used as junkyard sites. The lease specifically provided for the further expansion of these junkyards as the land was gradually brought up to grade; paragraph 20 of the lease states, in relevant part:

20. Subject to the written approval of Lessor's Works Manager, Philadelphia Plant, which shall not be unreasonably withheld, Lessee reserves the right and privilege to sublet that portion of the subject premises already filled to grade level and of no use to Lessee in conducting a landfill operation, provided that subletting shall be only to so called "Automobile Wrecking Yards."

When Schiavo took over the tenancy of Area B under the 1966 lease, this property was not vacant; to the contrary, Spence and Montgomery had left a substantial amount of debris on the property upon vacating it. Thus, in order to prepare the land for the further subleasing to junk car dealers, Schiavo was forced to expand the sum of at least $2,500.00.[8] Schiavo initially attempted to recover this amount from USG, but USG directed Schiavo to pursue Spence and Montgomery under the terms of the 1966 lease, under which USG had assigned to Schiavo all rights to rent under

---

7. Due to an apparent typographical error in the 1966 lease, the two 1963 leases were not specifically cancelled. (See Trial Exhibit P–15, ¶ 23). The parties have stipulated, however, that both 1963 leases between the parties were cancelled by the 1966 lease. (Joint Request for Finding of Fact # 13(a)).

8. Schiavo contends that the total cost of this operation was $4,391.70. The evidence, how-

ever, does not sufficiently establish the accuracy of this amount. Trial Exhibit P–19, which is a document relating to the debris left on the Spence and Montgomery property, states that the cost to Schiavo was $2,500.00; at the bottom of this document there are several cryptic numerical amounts, one of which is 4391.70. We cannot decipher the meaning of this number; we, therefore, find that the cost was at least $2,500.00.

the lease between USG and Spence and Montgomery. Since this assignment covered only rental rights, however, Schiavo could not force Spence and Montgomery to pay for the cleanup of the property.[9] After negotiations between plaintiff and defendant, USG agreed to pay Schiavo a $1,400 rental credit for the cleanup of Area B. Since we find that Schiavo paid at least $2,500 to have the land cleared, defendant was not wholly compensated for the expense of removing the debris.

With the exception of those areas which were the sites of junkyards, the leasehold property was, in January, 1966, generally clear of debris, with the exception of some waste which was the result of fugitive dumping on the property.[10] During the term of the lease (which was a year-to-year lease, to be automatically continued unless terminated by either party), the land was developed as contemplated by the parties.[11] Schiavo, through the operation of the landfill, gradually brought the land up to grade; as a portion of Area A was raised to grade level, it would be sublet to an automobile junk car dealer. In the meantime, junk car dealers continued to operate on Areas F and B, and that portion of Area A which had housed these dealers before 1966. Needless to say, as the number of junk car dealers on the leasehold property increased, the number of junk cars on the property likewise increased. The general nature and upkeep of these junkyards was, however, gradually improved as the years progressed, for the reason that the junk car industry was generally improving its image; in addition, the City began to put greater pressure on the dealers to keep their properties clean.[12]

There was also evidence that Michael Schiavo made periodic efforts to keep the junk car dealers in line, and to force them to keep their properties clean. Along with his verbal attempts to control his subtenants, Schiavo also required each dealer, as part of the terms of his lease, to pay a security deposit to cover the cost of any rent deficiency, as well as the cost of any necessary cleanup at the termination of the dealer's lease.[13] Generally, if this escrow money was forfeited, it was for failure to pay rent, although there was at least one instance in which it was forfeited for failure to clean up the property. Michael Schiavo also testified that if a sublease was terminated, and the dealer left debris on the property, Schiavo would bear the expense of cleanup; the purpose of the cleanup was primarily economic: Schiavo could not sublet a piece of land which was strewn

---

**9.** The Spence and Montgomery lease actually did not terminate until May 11, 1966, at which time Schiavo gained full control over Area B.

**10.** The evidence produced at trial established that the only effective means of preventing fugitive dumping was, in fact, to erect a chain link fence which would prevent outsiders from even entering onto the property. Fugitive dumping occurred during the entire course of the period from 1959 to 1974. The evidence showed, in fact, that fugitive dumping is virtually a custom with respect to vacant land, or land on which a landfill operation is in progress. As one witness eloquently put it:

Nothing will stop anybody from dumping, as I said before. If you are going to dump, you are going to dump. There's nothing in the world to stop them. (Trial at 1.227.)

**11.** There was one modification to the lease. In 1968, the parties negotiated a rent reduction for the property. This reduction was based upon the facts that USG's waste removal requirements had declined, only a small percentage of the leasehold property was actually being used as a landfill, and the junkyards were not pro-

ducing as much income as had been anticipated.

**12.** One junk dealer succinctly stated the reason for the gradual change in image:

It was going from an eyesore to where nobody wanted a junk car to where they realized they needed them. If you make it attractive and neat, you know, then you get more money for your merchandise, for one thing, and it's more desirable, a more desirable place to go. People is getting away from the dirty old image. (Trial at 1.41.)

**13.** During the period from 1966–69, the amount of this security deposit varied from $300–$500. In 1969, the amount was raised to $1,000.

In each of its subleases with the junk car dealers, Schiavo inserted a general cleanup clause, which stated:

4b4. The lessee agrees to keep the area clean, with no piling up of unnecessary old cushions, debris, etc., and clean off the lot upon vacating it. If the lessor must clean the lot the lessee will be charged.

with debris. Michael Schiavo testified that if another tenant was not coming onto property which a dealer had vacated, he would not clean up the property, and we accept this testimony.

In 1972, the landfill operation on the leasehold property was completed, and Schiavo continued its operations on the land only in its status as master tenant for the junk car dealers. After 1972, the number of dealers continued to increase, and the number of junk cars thus continued to multiply. In addition, the amount of debris left by fugitive dumpers increased after the close of the landfill, because Schiavo could no longer dump this waste in the landfill.

### D. The Termination of the 1966 Lease and the Removal of the Subtenants:

The 1966 lease provided that either party could terminate the lease upon 120 days written notice; the lease was properly terminated by Schiavo on August 1, 1973, effective January 1, 1974.[14] The termination was acknowledged by USG by letter dated September 7, 1973; this letter, from Frank Hansen, Real Estate Manager of USG, to Schiavo, laid the groundwork for the saga that followed—the second paragraph reads as follows:

> You recognize, of course, that as lessee it is your obligation to surrender the premises on the termination date in substantially the same condition as at the commencement of the lease. Consistent with this obligation, we shall expect you to remove all wrecked or abandoned automobiles, trucks, parts and other debris prior to the termination date. (Trial Exhibit P–49).

We find that this was the first notice which Schiavo received from USG, setting forth that USG expected Schiavo, under the terms of the 1966 lease, to return the leasehold property free and clear of debris. The 1966 lease contains no clause with respect to the responsibility for cleanup of the property. In addition, no representative of USG informed Schiavo, prior to September, 1973, either orally or in writing, that cleanup would eventually be required of Schiavo at termination; the testimony reveals that the cause of this omission was USG's belief that such notice was unnecessary, since USG believed that Schiavo would be fully aware of its alleged responsibility for cleanup, despite the fact that there was no specific lease provision which spelled out this duty.

After notice of termination, USG informed Schiavo that USG did not want the junk car dealers to remain on the property, and directed Schiavo to terminate the leases of these subtenants. Accordingly, Francis Dougherty, real estate agent for Schiavo with respect to the leasehold property, gave written notice to the subtenants in October, 1973, that their leases would be terminated, effective December 31, 1973. No mention was made in this termination letter from Dougherty of the junk dealers' responsibility to clean up their properties pursuant to the specific terms of their leases.

The junk car dealers, a notoriously difficult group with whom to deal in any case, quickly objected to the short amount of time which they had been given to vacate their premises. Basically, the stock in trade of an automobile junk car dealer is the metal scrap parts of the car; the tires and seats are generally worth little—it is the metal which has the value.[15] In October, 1973, the dealers were faced with an economically unenviable situation: they had been given a month and a half to negotiate new leases on another area or to go out of

---

14. The August 1, 1973 letter was from John Lamb, President of Schiavo, to Roy E. Starner, Works Manager of USG's Philadelphia plant. Mr. Lamb became president of Schiavo in 1968, and remained in that position until mid-1973.

15. The value of the junk car metal to the dealers, despite its unsightliness, was colorfully explained by one dealer at trial:

> Let me explain something to you about junk cars. You know, it's just the animal itself.

> A junk car looks exactly like that, a junk car. To somebody that doesn't know anything about junk cars, it's an ugly sight, it really is. I mean, you know, there's nothing beautiful about a smashed automobile or an old scrap, an old piece of scrap. Now, to me that's money.
> THE COURT: To you it's beautiful.
> THE WITNESS: Right. To me that's a picture of beauty. I wish I had a billion cars out there. (Trial at 7.96.)

business, and they had to arrange to remove their inventory from the premises, either through transportation to another lease site, or through sale. In addition, sale of the inventory would be hampered by the fact that all of the dealers had to vacate, resulting in a large amount of scrap material being dumped on the market at one time.

Several of the junk dealers informed Dougherty that they could not possibly vacate their lots by December 31, and asked for an extension of time. They were informed by Dougherty that this was impossible; one of the dealers telephoned Mr. Hansen of USG to request an extension, but he was rebuffed. On December 1, 1973, Schiavo reaffirmed the December 31 date. However, only one of the dealers [16] vacated his lot on that date, and this dealer was forced to leave a great amount of valuable scrap metal on the property because he had not had time to sell or remove it.

The other dealers formed an association to fight eviction; Schiavo began eviction proceedings immediately after January 1, 1974. A hearing was held in Municipal Court of the City of Philadelphia on March 4, 1974; at this hearing, the dealers were given a further 90 days from that date in which to vacate. While the Municipal Court eviction proceedings were technically a dispute between Schiavo and the junk dealer's association, counsel for USG sent an observer [17] to the hearing; he took no part in the proceedings, but was informed of the negotiations between respective counsel for Schiavo and the dealers on an ongoing basis. This agent of USG never objected to the extension of time given to the dealers.

In the meantime, USG had arranged for the sale of the leasehold property to Swann Oil Company (Swann), as part of the agreement of sale, dated January 18, 1974; closing was made conditional upon all debris being removed from the land. It was thus vital to USG's interests that the property be cleaned.

During the course of the summer of 1974, the junk car dealers gradually vacated the premises, either voluntarily or by eviction; by September, all of the dealers had left the property. A substantial amount of debris, however, remained on the property after the dealers had departed. The evidence shows that Schiavo did very little to force the dealers to obey the terms of their leases with respect to the cleanup of the property. Neither Dougherty, nor Lamb, nor William Breene (who became managing agent of Schiavo in April, 1974, and the president of the company in August, 1974), put great pressure on the dealers to clear off all the debris, although periodic visits were made by Lamb to the property; he would remind the dealers that it was their responsibility to clean up. In addition, Lamb provided the dealers with free trash barrels to encourage them to put the debris in these containers and then remove them. Schiavo and its agents were, however, primarily concerned with removing the *dealers themselves* from the land, which was in and of itself no trifling task.

It is highly speculative that any degree of pressure would have succeeded in forcing the dealers to remove all the debris. Testimony from several witnesses established that junk car dealers rarely, if ever, clean up their properties upon leaving; we have already noted that these dealers were, in general, very difficult persons against whom to enforce obligations.

During the period when the dealers were vacating the premises, Schiavo denied that it was its responsibility to remove the debris left by the dealers, or the debris accumulated through fugitive dumping. As a result, in order to guarantee that the sale of the property to Swann would go through, USG was forced to hire a private contractor, George Hunter, to clear the debris. Hunter performed this work at a total cost of $144,500; the closing on the sale of the property to Swann was held on September 30, 1974.

16. The dealer who vacated was Valentino Piacentino, Jr.

17. This observer was Ralph M. Harter, who was an associate in the firm of Duane, Morris and Heckscher.

### E. Condition of the Leasehold Premises in 1974:

The principal factual disputes between the parties are the amount and nature of the debris, which was left on the property at the lease termination in 1974, as compared with that which was on the leasehold premises at the commencement of the lease in 1966. In addressing this question, we must separately consider the three sub-areas of the leasehold: 1) Area B, Area F, and that portion of Area A which had been the site of junk car dealerships prior to 1966; 2) that part of Area A fronting on Essington Avenue, and back to a depth of approximately 100 feet—it is this section onto which Schiavo gradually extended its subleasing to junk car dealers; and 3) the back portion of Area A, behind the site of the junk car dealers—this area was not sublet to the dealers, even after the landfill was completed.

It is also necessary to distinguish between three types of debris: 1) junk car metal scrap, which was valuable inventory for the dealers, although it was just debris as far as USG and Swann were concerned; 2) tires and car seats, which comprised the main portion of the waste left on the property by the dealers; and 3) material from fugitive dumping, which took virtually every imaginable form, from watermelons to dead cats to junk car debris deposited by third persons.

When the property was cleared in 1974, there was debris spread generally throughout the leasehold area, with the exception of the areas of three or four dealers who had thoroughly cleaned their land. Of the material cleared, approximately forty percent was found on the front portion of the property, which had housed the dealers; the remaining sixty percent was cleared from the back portion of Area A. The front portion of the land (both Areas A and B) was virtually devoid of fugitive dumping material; it was almost entirely the residue of the junk car dealers' operations. Very little of this debris, however, was metal scrap; the dealers, with only minor exception, had taken their valuable metal scrap when they left, or had sold it.[18] Thus, the waste on the front portion of the land was principally automobile tires and seats.

The debris on the back portion of the land was made up of approximately eighty percent of the residue of the junk dealers whose waste had spread beyond their boundaries (again, principally tires and seats), and approximately twenty percent fugitive dump material.

Those sub-areas which had been the site of junk car dealers at the commencement of the lease were left, at the termination of the lease, in the same, or in cleaner condition than that which existed in 1966. There were two reasons for this: first, as noted earlier, *the image of the junk car industry was changing,* and dealers were generally more conscious of maintaining an orderly premises; second, and of greater significance, a shredding machine operation used by the dealers started to accept automobile seats in 1973; previously the machine had not been equipped to handle them. Thus, instead of allowing these seats to accumulate on the property, the dealers were able

---

**18.** USG, in attempting to prove the cluttered nature of the property in 1974, as opposed to its condition in 1966, places great reliance upon a series of photographs introduced at trial. Trial Exhibits P–30 and P–34 are aerial photographs of the leasehold property, the former taken in 1968, and the latter in 1971. These photos serve principally to show the proliferation of junk car dealers on the property as the land was gradually brought up to grade. We have found that Schiavo subleased to more junk dealers as the landfill operation progressed; it is a natural incident of this increase in dealers that there be a coincident increase in the number of junk cars and debris, and it is this fact which is shown by P–30 and P–34.

Trial exhibits P–86 and P–86A consist of a series of photographs identified as depicting portions of the leasehold property taken during the summer of 1974 when Hunter was cleaning the property. While these photos show a substantial amount of debris on the property, they are somewhat misleading, in that they were obviously taken after Hunter had bulldozed the majority of the debris into huge piles preparatory to putting it into trucks. Therefore, these photos show, in essence, the total amount of debris cleared, and not the general nature of the property at the termination of the lease.

to bring them to the shredder and be paid for waste tonnage.

The rest of the leasehold area, both the front portion first sublet to junk dealers after 1966, and the back portion, had more debris on it in 1974 than it had in 1966; this conclusion is obvious, since we have found that this area was generally clear in 1966, with the exception of scattered fugitive dump material. Whatever debris was on the land in 1974 was therefore more than had existed when the lease term commenced. With respect to the front portion which were the subleased areas, however, we emphasize that the remaining debris was the residue of these junk car operations—debris which stemmed from the precise type of land development that had been contemplated by the parties to the 1966 lease.

## III. DISCUSSION:

The basis for federal jurisdiction in this case is diversity of citizenship between the parties. 28 U.S.C. § 1332. We are, thus, obliged to apply the substantive law which the courts of Pennsylvania would apply. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### A. Pretrial Ruling on Parol Evidence:

As part of the final pretrial order, plaintiff indicated its intention to introduce evidence relating to the negotiations which led to the signing of the 1966 lease; specifically, plaintiff wanted to show the reasons why a specific cleanup clause did not become part of the lease. Defendant objected on the ground that this evidence was barred by the parol evidence rule; defendant contended that the lease was not ambiguous in any of its terms, and that it was not procured through fraud, accident, or mistake. Prior to trial, we ruled that all evidence of lease negotiations was inadmissible under the parol evidence rule; we now reaffirm that finding.

Under the parol evidence rule, when parties to a contract have reduced their agreement to a written form, and this writing appears on its face to be the entire agreement of the parties, evidence of prior or contemporaneous negotiations or agreements, which either vary or contradict that writing, is inadmissible. Furthermore, when the writing expressly states that it contains the entire agreement of the parties, it is conclusively presumed to do so, absent a showing that this integration clause was procured through fraud, accident, or mistake. *Gianni v. Russell & Co.,* 281 Pa. 320, 126 A. 791 (1924).

The lease in the instant case contains an integration clause which provides as follows:

It is expressly understood and agreed by and between the parties hereto that this lease and the riders attached hereto and forming a part hereof set forth all the promises, agreements, conditions and understandings between Lessor or its Agent and Lessee relative to the demised premises, and that there are no promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. It is further understood and agreed that, except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this lease shall be binding upon Lessor or Lessee unless reduced to writing and signed by them. (Trial Exhibit P–15, ¶ 17.)

Plaintiff does not contend that the lease is ambiguous as to any term, nor that fraud, accident, or mistake can be established; to the contrary, plaintiff's counsel admitted at oral argument following trial that the contract was unambiguous. Plaintiff contends, however, that because the lease is *silent* with respect to the cleanup of the property, that parol evidence is admissible to show the intent of the parties on this issue. The short answer to this contention is that if it had been the intent of the parties specifically to provide for cleanup, a provision to this effect should have been inserted into the admittedly integrated lease document.[19] It is clear that evidence

---

19. To support its claim that the parol evidence should have been admitted, USG cites *Commonwealth v. Berger,* 11 Pa.Cmwlth. 332, 312 A.2d 100 (1973). Wile evidence of lease negotiations was admitted in *Berger,* there is no indication that the contract before the court

of intent with respect to the meaning of the contract terms is not admissible in the absence of ambiguity. *Pavlich v. Ambrosia Coal and Construction Co.*, 441 Pa. 210, 273 A.2d 343 (1971). As stated by the Supreme Court of Pennsylvania over twenty years ago:

> In interpreting this agreement it is our duty to attempt to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles [citations omitted]. In order to ascertain that intention "the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject matter of the agreement." [citations omitted]. However, that does not mean that where there is an integrated agreement . . . . evidence of the negotiations which have led to the formation of this integrated agreement is admissible to show an intent at variance with the language of the written agreement . . .

*Appeal of Edwin J. Schoettle Co.*, 390 Pa. 365, 372, 134 A.2d 908, 912 (1957).

In order to consider evidence of negotiations in the matter before us, we would have to find that *silence* with respect to the responsibility of cleanup at the termination of the lease, amounts to an *ambiguity* in the contract. There is simply no basis for such a holding, nor does plaintiff contend there is. The lease, *which is an integrated document, and unambiguous in its terms*, must be interpreted within its four corners; the intent of the parties must be gleaned from the language of the lease. We, therefore, reaffirm our prior ruling on this issue, and hold that parol evidence with respect to negotiations leading to the signing of the 1966 lease agreement between USG and Schiavo was property excluded at trial, particularly, since that evidence would have added a material provision to the lease.

was an integrated document. The lease before us in the instant matter does, of course, contain

**B. The Existence of An Implied Covenant:**

■ The 1966 lease contained no provision requiring Schiavo to clean the land, or to return the leasehold property to USG free of debris. Therefore, the principal basis upon which USG relies in seeking recovery from Schiavo for the expense of clearing the debris is Schiavo's alleged breach of the implied covenant to return the leasehold premises in substantially the same condition in which it existed when received, reasonable wear and tear excepted. Under Pennsylvania law, this covenant exists even in the absence of an express covenant, *unless the implied covenant is negated by contrary language in the lease.* *Earle v. Arbogast*, 180 Pa. 409, 36 A. 923 (1897); *Patton v. United States*, 139 F.Supp. 279 (W.D.Pa. 1955); *Riverview Properties, Inc. v. United States*, 102 F.Supp. 934 (M.D.Pa.1952). Plaintiff contends that the return of the property with junk car debris and fugitive dump material still on the land was a clear breach of this implied covenant. Before analyzing this contention, we must deal initially with Schiavo's claim that this implied covenant was negated by the terms of the lease.

■ Defendant avers that the integration clause in the lease precludes the finding of any implied covenant. Since this clause provides that no agreements or conditions exist outside the terms of the lease, argues Schiavo, we cannot place any greater duties upon it beyond those which are specifically delineated in the written contract. Defendant contends that the integration clause provides language contrary to any duty to return the premises in the same condition, reasonable wear and tear excepted, and that this implied covenant has thus been expressly negated.

We do not believe that this argument withstands analysis. We have noted that the intent of the parties with respect to the meaning of the lease terms must be determined from the face of the document. The integration clause, in relevant part, states as follows:

an integration clause, and this is a crucially distinguishing factor.

[T]here are no promises, agreements, conditions, or understandings, *either oral or written*, between [the parties] other than are herein set forth. (Emphasis supplied.)

The obvious intent of this language was to preclude the introduction of parol evidence with respect to negotiations and agreements which are not incorporated in the contract. This is the generally recognized purpose of such an integration clause. An implied covenant, however, cannot be characterized as an "oral or written" agreement or understanding; we believe that the insertion of these words makes it clear that the negation of any implied covenant which might otherwise adhere was not within the contemplation of the parties in drafting the integration clause. *Cf. City of Philadelphia v. Page*, 363 F.Supp. 148 (E.D.Pa.1973), in which the court held that the implied warranty of habitability was not negated by a clause which stated that the delineated express warranties were the only warranties to which the seller would be bound.

■ In seeking to negate the existence of the aforementioned implied covenant, Schiavo advances the following points: 1) the lease term specifically permitting subleasing to junk car dealers, did not mention any cleanup duty, thus negating any finding of an implied covenant to return the premises as received, reasonable wear and tear excepted; and 2) the express duty in the lease requiring peaceable surrender of the premises at the termination of the lease precludes a finding of any further implied duty.[20] We summarily reject both of these contentions. With respect to the first, the mere fact the lease directs that a specific use be made of the property simply does not establish that the parties intended to relieve the lessee of the duty to rectify the consequences of that use. This clause cannot be interpreted as language contrary to the existence of the implied covenant.

■ The second of Schiavo's contentions is refuted by the reasoning in *City òf Phila-*

**20.** Schiavo also contends that the previous dealings between the parties, and specifically the inclusion of a cleanup clause in the two 1963 leases, negates the finding of an implied covenant with respect to the 1966 lease. How-

*delphia v. Page, supra* ; the fact that the parties resolved to memorialize one termination duty does not evidence an intent to reject another duty of a different nature. Defendant argues that the insertion of an express covenant excludes a contradictory, implied covenant. *Brimmer v. Union Oil Co.*, 81 F.2d 437 (10th Cir.) *cert. denied*, 298 U.S. 668, 56 S.Ct. 833, 80 L.Ed.2d 1391 (1936). We do no believe, however, that a duty to deliver land at the termination of a lease is contradictory to a duty to deliver that land in a certain condition. The covenants are separate and distinct.

*Having found no language to the contrary in the 1966 lease, we hold that the defendant had a duty to return the leasehold premises to USG at the termination of the lease, in substantially the same condition as existed at its inception, reasonable wear and tear excepted.*

*C. Breach of the Implied Covenant:*

*In determining whether Schiavo is in breach of this implied covenant, we must separately consider three areas of the leasehold property: 1) the area previously leased to junk car dealers; 2) the area landfilled and sublet to dealers during the term of the lease; and 3) the back portion, landfilled but not leased to dealers.*

*(i) The Area Previously Leased to Junk Car Dealers*

■ At the commencement of the leasehold term in 1966, Area B, Area F, and another 200 foot portion of Area A adjoining Area F, had been the site of junk car dealers for several years. We have found that, as a result of these operations, there was a substantial amount of debris and junk cars already on the property at the execution of the lease in 1966. Furthermore, we have found that at the termination of the lease, this portion of the property was left by Schiavo in either the same, or in better condition than that in which it had been in 1966. It is therefore obvious, based upon these findings, that Schiavo did not

ever, in interpreting the language of the 1966 lease within its four corners, we have not considered evidence with respect to the prior negotiations or dealings between the parties.

breach its implied covenant with respect to these areas. The land was returned in substantially the same condition as that which existed when received, reasonable wear and tear excepted.

### (ii) The Area Sublet to Junk Car Dealers for the First Time During the Leasehold Term

We have found that the portion of Area A not previously leased to junk car dealers at the commencement of the lease was generally clear of debris at that time, with the exception of some fugitive dump material. The part of this property fronting on Essington Avenue to a depth of approximately 100 feet as it was gradually raised to grade level during the lease term, was sublet to dealers. As a result of these operations, a substantial amount of junk car debris, principally tires and some car seats, was left on the property at the termination of the lease. USG vigorously contends that the failure of Schiavo to clear this debris off the property was an obvious breach of Schiavo's implied covenant; the accumulation of rubbish to this degree, contends plaintiff, cannot be considered "reasonable wear and tear." *We find, however, that USG has failed to meet its burden of establishing that, in the context of the junk car industry, the wear and tear to the land was excessive or unreasonable.*

 It is of cardinal importance to note that USG specifically approved subletting of the leasehold property by Schiavo to junk car dealers, as the property was filled to grade. Therefore, while this portion of Area A was vacant in 1966, *the land was developed in the precise manner contemplated by the 1966 lease.* In determining

that wear and tear which is "reasonable", we must consider the use to which the property was put, a use which, in this case, was agreed to by the landlord. In *Codman v. Hygrade Food Products Corp.*, 295 Mass. 195, 3 N.E.2d 759 (1936), the court was confronted with a lease which, by its terms, required the lessee to return the property (a building) in "good tenantable repair." Interpreting this term, the court stated:

> The phrases "in good tenantable repair" and "in good condition" appearing in such a lease do not have a fixed or technical meaning which is always the same regardless of the character or use of the building to which they refer. A building adapted for use as a tannery might be in good condition for that purpose and absolutely untenantable for use as a watch factory. In the application of phrases of such general significance to a building which is the subject matter of a lease various things are to be taken into account. Among these are . . . the use to which the building is to be put and the character of a business there to be carried on [citations omitted]; . . . and the class of tenant and the kind of business of a tenant who would be likely to lease the building [citations omitted].

3 N.E.2d at 760.

We believe this reasoning is apposite to the facts of this case. *We, therefore, reject plaintiff's argument that because the land was vacant when leased, we must consider only what is reasonable wear and tear to vacant land; USG cannot consent to a specific use of its property, and then ask this court to ignore the natural consequences of that use.*[21] We cannot determine that

---

21. One of the principal cases relied upon by USG, *U. S. v. Jordan*, 186 F.2d 803 (5th Cir.), *aff'd per curiam*, 342 U.S. 911, 72 S.Ct. 305, 96 L.Ed. 682 (1951), is distinguishable from the case at bar. In *Jordan*, the government temporarily condemned certain private lands, and leased others, for use as a gunnery range; following the return of the land to the property owners, they sued for damage to the standing timber caused by the lodging of bullets in the trees; the owners argued that the compensation awards and lease rentals were not sufficient to cover this damage. The government argued that because the intent of the government was to use the land as a gunnery range,

the lodging of bullets in the timber was the consequence of the normal use of the property. In rejecting this argument and affirming the district court's award of damages to the landowners, the court stated, *inter alia*:

> The extremely low rental which was paid [under the leases], in some instances as low as fifty cents an acre, strongly supports the ruling that timber damage was not included in the rental figure.

*Id.* at 806. In the case at bar, there is not sufficient evidence to support an inference that the rental fee was so low that the parties clear-

"wear and tear" which is "reasonable" without considering the nature of the business conducted on the land.[22] While USG was primarily interested in the use of the property as a landfill, the parties agreed in the lease that Schiavo could sublet to the dealers after the land was raised to grade. It is an understatement to say that the establishment of junk car dealerships is not the most elegant use to which land may be put. The uncontradicted evidence produced at trial established that junk car dealers were, in general, an extremely difficult group with whom to deal; that it was an arduous, if not impossible, task to keep them within the bounds of their obligations; that there was a natural expansion of debris beyond their lease boundaries; and that upon termination of a junkyard lease, the dealer rarely, if ever, cleared the property of accumulated debris beyond removing the scrap metal which could be sold. USG, in fact, suffered this experience with Spence and Montgomery, who failed to clear Area B at the termination of the 1960 lease covering that property; as a result, Schiavo was forced to remove the accumulated debris before it could relet the premises to other dealers.

Initially, it is clear that the accumulation of debris on this portion of the leasehold property was not more than reasonable wear and tear in the context of the junk car industry. The evidence established that in the later years of the lease term the general condition of the dealers' properties improved, due both to the industry's goal to improve its image, and to the fact that the shredder began to accept car seats.

Second, with respect to the failure to clear the debris at the termination of the lease, we find that USG has failed to prove by a preponderance of the evidence that this condition was more than reasonable wear and tear to junkyard property. The evidence shows that the dealers virtually never cleaned their properties upon leaving, despite their standard lease obligation to do so. We cannot ignore this evidence. When the lease was executed in 1966, both parties had had experience with junk car dealers; nevertheless, no provision was made in the lease with respect to the responsibility for clearing the debris which the dealers would inevitably produce. We cannot imply an obligation to return land wholly free of debris, when the evidence provides no support for a finding that junkyard property would normally be returned in this condition. We cannot simply assume in a vacuum that no one would ever expect leased land to be returned covered with debris, and that this condition is therefore, necessarily, unreasonable wear and tear as a matter of law. It is the record, and not our assumptions, which must support any such finding, and the record in this case fails to provide this foundation.[23] We,

---

ly did not contemplate that USG would bear the cost of cleanup.

22. Plaintiff produced the testimony of a real estate expert, Charles A. Thomas, who stated that the debris left on the property by Schiavo diminished the value of the land with respect to the "highest and best use" of the land. This issue, however, is not before us; we must determine what is reasonable wear and tear to the land with respect to the operation of a junkyard, for this was the use to which the parties agreed. It is undisputed that the debris diminished the value of the property with respect to the use to which Swann wished to put it. See, Getty Oil Co. v. Mills, 204 F.Supp. 179, 197 (W.D.Pa.1962); Codman v. Hygrade Food Products Corp., 295 Mass. 195, 3 N.E.2d 759 (1936).

23. USG argues that Schiavo's inclusion of a cleanup clause in all of the subleases with the dealers, as well as Schiavo's periodic demands that the dealers keep the land in good condition, is probative evidence with respect to Schiavo's understanding of their responsibility to return the land clear of debris, and of the intention of the parties to the lease that cleanup was Schiavo's responsibility. While we will consider the evidence on this issue, see, Wigmore, Evidence, 3d Ed. 1940, § 377, we do not believe, in light of the entire record, that this evidence shows any "understanding" on Schiavo's part of their responsibility to USG for cleanup. Schiavo was interested in generating more revenue from the land, and it was therefore in its interest to rent to the dealers for this purpose. If a dealer vacated his property, or was evicted, it would be easier to rent the land to another dealer if the property were left clean. Additionally, we have found that the City of Philadelphia wanted the dealers out of the area because their operations created an eyesore; therefore, to the extent that Schiavo could encourage the dealers to keep their areas orderly, it might well do so to prevent harassment from the City. Therefore, both the cleanup clauses in the lease, and Schiavo's periodic

therefore, hold that with respect to that portion of the leasehold property first leased to junk car dealers during the term of the lease, Schiavo returned the land in substantially the same condition as existed when it received the land, reasonable wear and tear excepted.

*(iii) The Back Portion of the Leasehold Property:*

The back portion of Area A, which was not leased to junk car dealers, nevertheless was left with a substantial amount of debris on it, both from dealers who expanded their materials beyond their boundaries, and from fugitive dumping. In determining whether Schiavo is in breach of its implied covenant with respect to this area, we must differentiate between these two categories of debris.

*(a) Junk Car Debris:*

■■ Concentrating first upon the debris which was the result of the junk car operations on the front portion of Area A, we again emphasize that the 1966 lease specifically permitted junk car operations on *all of the leasehold property.* While Schiavo did not specifically lease the back portion to dealers, it could have done so. Furthermore, we have found that junk car dealers naturally expand beyond their boundaries onto any available land; the accumulation of debris on the back area was neither unexpected nor unreasonable in the context of the junk car industry. Because the 1966 lease approved the expansion of dealer operations onto the entire leasehold property, the accumulation of debris on the back area was not a use contrary to lease provisions. Therefore, based upon the reasoning in the previous section, we again find that plaintiff has failed to prove, on the record before us, that the accumulation of junk car debris was, in the context of this industry, unreasonable wear and tear to the land. Accordingly, we find that USG has not established a breach by Schiavo of the implied covenant with respect to the dealers' debris left on the back portion of the property.

demands to the dealers to keep their areas neat, were beneficial to Schiavo's own immediate economic interest. Accordingly, this evi-

*(b) Fugitive Dumping:*

■■ The evidence produced at trial revealed that fugitive dumping was a normal incident of vacant property; illegal dumping had been occurring on the leasehold property for many years prior to the lease, and it continued on the back portion of the property throughout the term of the 1966 lease. There is, however, a critical distinction between the accumulation of junk car debris, and the accumulation of fugitive dump debris: *fugitive dumping was not contemplated by the parties to the 1966 lease.* While its occurrence may not have been unexpected, provision was obviously not made in the lease for fugitive dumping. USG cannot be held to have approved of the accumulation of this type of debris; indeed, we must consider this wear and tear to the land *as if the lease had been for vacant land.* Under these circumstances, we believe that the amount of fugitive dump material which was left on the land at the termination of the lease was unreasonable wear and tear to the land. *Despite this finding, however, plaintiff has not proven that Schiavo is in breach of the implied covenant, because USG has failed to prove that the accumulation of this debris was caused by the negligence of defendant; we find that under Pennsylvania law, negligence is a required element in proving a breach of the implied covenant to return leasehold property in substantially the same condition as when received, reasonable wear and tear excepted.*

USG argues strenuously that no proof of negligence is required to establish a breach of the implied covenant; it is, USG avers, only the condition of the land, and not the acts or omissions of the defendant which may have caused that condition, which we must examine in this case.

*To determine whether negligence is an element of breach of this implied covenant under Pennsylvania law, we must focus upon the seminal case in this area.* In *Earle v. Arbogast,* 180 Pa. 409, 36 A. 923 (1897), the court stated in relevant part:

dence is of very little weight in proving any responsibility for general cleanup at the termination of the main lease.

Generally, in the absence of an express covenant on the subject, the law implies a covenant on the part of the lessee so to treat the demised premises that they revert ·to the lessor unimpaired, except by usual wear and tear, *and uninjured by any willful or negligence act of the lessee.* The implied covenant does not, however, extend to the loss of buildings by fire, flood, or tempest, or enemies, which it was not in the power of the lessee to prevent, and there is no implied covenant that the lessee shall restore buildings which have been destroyed by accident without fault on his part. (Emphasis supplied.)

USG argues that this language supports the creation of *two* covenants: 1) a covenant to leave the premises unimpaired except by usual wear and tear; and 2) a covenant to leave the property uninjured by any willful or negligent act of the lesee. The latter covenant, which requires proof of negligence, is only applicable, avers USG, in situations in which damage has been caused by a sudden and singular incident, such as a fire or explosion; the former covenant applies to normal use, as in the case at bar, and does not require proof of negligence.

While the language in *Earle* is somewhat ambiguous, we do not believe these words may fairly be interpreted to create two covenants; no case subsequent to *Earle* supports such a reading. In 22 P.L.E. Landlord and Tenant § 237, the implied covenant is expressed as follows:

Even in the absence of an express covenant, there is an implied obligation on the part of a lessee to treat property leased in such a manner that no injury is done to the inheritance, and to return the property to the lessor in as good condition as when received, ordinary wear and tear excepted. *However, a lessee may not be liable for damage and failure to return the premises as leased, in the absence of proof of negligence.* (emphasis supplied).

Likewise, in 51 C.J.S. Landlord and Tenant § 408, 1947, only one covenant is stated, with negligence a required element:

Independently of express covenant, the law imposes on a tenant the obligation to return the premises at the termination of the tenancy substantially in the same condition as when he received possession, and to restore the property to the landlord at the end of the term unimpaired by the negligence of the tenant.

*Based upon this authority, and upon our own reading of the Earle opinion, we reject plaintiff's argument on this issue. We believe that Pennsylvania law recognizes only a single implied covenant to return property substantially in the condition received, and that to prove a breach of this covenant, the landlord must prove that the damage to the property was caused by the negligence of the tenant. See, Mumma v. Club Plan of America,* 6 D. & C.2d 266 (Dauphin County 1955); *See also, Womack v. Tripp,* 137 S.W.2d 180 (Tex.Civ.App.1940); *Arkansas Fuel Oil Co. v. Connellee,* 39 S.W.2d 99 (Tex.Civ.App.1931).

■ The record fails to establish any negligence of Schiavo with respect to the accumulation of fugitive dump debris on the back portion of the land. We have found, as the record clearly reveals, that it was virtually an impossible task to prevent fugitive dumping on the vacant areas. In an attempt to control the constant fugitive dumping, Schiavo hired a twenty-four hour watchman to patrol the premises. Schiavo made frequent reports to the police, and sought assistance from the Police Department to prevent the illegal dumping; there were also wooden barricades erected to prevent access to the property, but these were easily bypassed by the fugitive dumpers. While these measures were not successful, they conformed to the standard which a reasonable man would exercise under similar circumstances; Schiavo was, therefore, not negligent. *Gift v. Palmer,* 392 Pa. 628, 141 A.2d 408 (1958). The evidence demonstrated, in fact, that the only means of assuring an end to fugitive dumping was the erection of a chain link fence, at an estimated cost of approximately $50,000. Barring any provision in the lease requiring Schiavo to do so, it is clear that Schiavo was under no duty to USG to expend such a large sum; indeed, USG does not even al-

lege that Schiavo had this duty. *See, Long v. Fitzsimmons*, 1 W. & S. 530 (Pa.1841).

Therefore, we hold that with respect to the accumulation of fugitive dump debris on the back portion of Area A, that while the land was returned by Schiavo to USG in a condition in which there was unreasonable wear and tear, USG has failed to establish that this damage was caused by Schiavo's negligence; plaintiff, accordingly, has failed to prove a breach of the implied covenant.

*D. Breach of the Express Covenant to Surrender the Premises Peaceably at the Termination of the Lease:*

USG's final ground upon which recovery is sought may be dismissed summarily. USG contends that the return of the leasehold property by Schiavo in a littered condition constituted a breach of the specific lease obligation to surrender the premises peaceably. (Lease ¶ 4(d)). USG argues that the debris on the property prevented it from exercising dominion and control over the land and this establishes a breach of the express covenant to surrender peaceably. We have already noted, however, that the covenant to surrender land peaceably is distinct from the covenant to surrender land in a certain condition. See Section III(B), *supra*. Schiavo peaceably returned the land in the condition required by the implied covenant to return the land in substantially the same condition as when received, reasonable wear and tear excepted. In the cases cited by plaintiff on this issue, the tenant was under an *express duty* to remove possessions from the property. *Abrams v. Sherwin*, 86 Pa.Super. 189 (1925); *Ide v. Finn*, 196 App.Div. 304, 187 N.Y.S. 202 (1921); *Mott. Pipe & Supply Corp. v. Blue Ridge Coal Corp.*, 208 Misc. 601, 146 N.Y.S.2d 607 (N.Y.Mun.Ct.1955). In the case at bar, defendant had no express obligation to remove the debris; rather, Schiavo had only an implied duty with which, we have found, it complied. We, therefore, find that defendant did not breach the ex-

press covenant to surrender the premises peaceably.

Finally, plaintiff argues that because the debris diminished the value of the land, Schiavo committed waste to the property. This argument, standing alone, is clearly untenable. In determining whether waste has been committed, a court must consider the nature of the lease, and the reasonableness of the use made of the premises under the lease. 78 Am.Jur.2d, Waste § 1; Stern, *Trickett on the Law of Landlord and Tenant* § 62. The use to which Schiavo put the land was not unreasonable under the lease; rather, it was *specifically approved* by the lease. The debris was a natural incident of the business of junk car dealerships. Therefore, whether this debris diminished the value of the land with respect to some other purpose for which USG might subsequently desire to use the property, is not relevant *in determining whether Schiavo committed waste under the 1966 lease.*

## IV. FINDINGS OF FACT—COUNTERCLAIM:

The genesis of the counterclaim is a lease between USG and Schiavo dated July 20, 1970. Under this agreement, USG leased to Schiavo a 12.2544 acre tract of land adjacent to Areas A and B, and fronting on the Schuykill River; this tract has been designated as Area C. This land was below grade and thus available for a landfill operation. By 1970, Area A had been nearly raised to grade, and it was clear to the parties that Area A would only be available as a landfill for a short time longer.[24] Both parties were interested in continuing their business relationship, which involved both landfilling and waste haulage; thus, after USG had obtained a zoning permit allowing Area C to be used for landfill purposes, the parties entered into the 1970 agreement. The 1970 lease was, in all material respects, virtually identical to the 1966 lease for Areas A and B.[25] The agreement was to continue from year-to-year, and could be

---

**24.** Area A was subsequently closed as a landfill in 1972.

**25.** The 1970 lease was admitted at trial as Trial Exhibit P–31.

terminated by either party upon 120 days written notice.

The subject matter of the dispute on the counterclaim concerns the alleged wrongful termination of the lease by USG in April, 1972, after the property had been sold by USG to Swann Oil Company (the same corporation which subsequently purchased Areas A and B). Schiavo alleges that it was assured by USG during 1970 and 1971 that the property would not be sold until the landfill operation was completed, and that based upon these assurances, Schiavo expended approximately $200,000 in building an access road to Area C, and in purchasing new landfill equipment to be used in that area.

The original expectation of the parties was that Area C would be available as a landfill area for approximately two years; however, new technology and new equipment in the field convinced Schiavo that the period could be extended to approximately four years. It was believed by Schiavo that it was in the interest of both parties to extend the life of the landfill for as long as possible. Nevertheless, USG had had the property available for sale since 1966, a fact of which Schiavo was aware.

Initial consideration was given by Schiavo to the purchase of new landfill equipment early in 1970, *prior to the execution of the lease for Area C.* At that time, John Lamb, president of Schiavo, sought assurance from USG that the landfill property would not be sold until it had been raised to grade, and that the purchase of the equipment would be a worthwhile investment for Schiavo. It is not clear from the record whether Lamb was inquiring only about Area A, on which the landfill operation was presently proceeding, or also about Area C, on which the parties anticipated continuing the landfill.

John Lamb testified that in seeking reassurance from USG, he spoke to Roy Starner, the USG Philadelphia plan manager;

Lamb told Starner that he was "thinking" about purchasing the equipment, and "wanted to feel comfortable" as far as the continuation of the landfill was concerned. Starner responded that he would check with USG's main office in Chicago; approximately a week later, Starner telephoned Lamb, and told him that "as far as I can find out and as far as I know, there is absolutely nothing in the wind with respect to a prospective buyer or the sale of that land." (Trial, 9.100.) When the lease was executed in July, 1970, however, there was no provision made guaranteeing the completion of the landfill. Indeed, Schiavo made no objection to the provision in the lease permitting termination upon 120 days notice. While the record is not entirely clear on precisely when Schiavo purchased the new equipment, it was apparently not until after the lease for Area C was signed by the parties; the cost of the equipment was approximately $100,000.

When the lease for Area C was executed in 1970, a problem existed with respect to access to that area; there was no public thoroughfare running to the property. There were only two means of access: 1) across Area A, and over railroad tracks which separated Areas A and C;[26] and 2) over a rough, dirt roadway which ran to Passayunk Avenue, a distance of approximately three tenths of a mile.[27] Schiavo originally hoped to reach Area C with its equipment by traveling through Area A; however, it was soon discovered that the equipment was too heavy to operate across the recently landfilled Area A, and, in addition, the landfill vehicles could not maneuver the incline over the railroad tracks. Schiavo then attempted to reach Area C by means of the unfinished access road from Passayunk Avenue; this also proved unfeasible, due to the weight of the equipment.

Confronted with this situation, Schiavo considered the possibility of improving the

---

26. These railroad tracks were owned by the Penn Central Transportation Company.

27. This road is no longer the only access to Area C. In 1973, the City of Philadelphia opened 67th Street, which in 1970 was only a paper road. 67th Street, a public thoroughfare, now provides full access to Area C.

Passayunk Avenue road to permit the movement of heavy equipment upon it. As this operation involved a substantial expense, however, Lamb, in early 1971, again sought assurance from USG, specifically from Starner, that Area C would not be sold in the near future, but would be available for the life of the landfill. Starner again checked with USG's main office in Chicago, and again told Lamb that as far as Starner could determine, there was no immediate plan to sell the property. We find, however, that *no specific promise or assurance* was given by USG to Schiavo that the property would not be sold. Starner's statements to Lamb relative to the sale of the property were clearly not absolute; they contained the obvious disclaimer that Starner had only checked "as far as he could determine." Schiavo neither sought, nor received, any written assurance that the property would continue as a landfill. In any case, following the discussion between Lamb and Starner, Schiavo improved the access road from Passayunk Avenue; this was done in early 1972.[28] The improvement of the road increased the value of Area C to some degree, since it provided immediate and functional access to the land.

USG began initial negotiations with Swann Oil Company for the sale of Area C during July or August of 1971; these negotiations became serious sometime during December, 1971, and January, 1972; an agreement of sale was signed by USG and Swann in February, 1972. During the course of these negotiations, Swann requested that USG keep the potential sale confidential; consequently, USG did not inform Schiavo of the possibility that Area C might be sold to Swann. However, at a luncheon meeting on December 2, 1971, attended by Lamb, Starner, and Frank Hansen, the Real Estate Manager of USG, Lamb was informed by Hansen that there was "interest to sell this property." (Trial Exhibit P–37.) At this meeting, Hansen informed Lamb that USG would keep Lamb abreast of any developments with respect to

the land. We find again, however, that no absolute assurance of communication was given by Hansen; in particular, Hansen made no commitment which would include a breach of the duty of confidentiality which USG owed to Swann.

Following the sale of Area C to Swann, USG on April 5, 1972, gave proper notice of termination of the 1970 lease; the termination was to become effective July 6, 1972. (Trial Exhibit P–35.) During the period following notice of termination, Schiavo accelerated the landfill operation on the property. As a result, when the termination became effective and Schiavo vacated the land, we find that Area C was raised to grade, and in fact, was slightly above grade.

## V. DISCUSSION OF THE LEGAL ISSUES:

Schiavo contends that the alleged misrepresentations of USG with respect to the potential sale of Area C give rise to causes of action for: 1) unjust enrichment; 2) equitable estoppel; and 3) deceit. We find these contentions to be without merit on the record before us.

### A. Unjust Enrichment:

Under Pennsylvania law, to recover under the equitable doctrine of unjust enrichment, plaintiff must prove two elements: *first*, an enrichment to another; and *second*, a resulting injustice if recovery for the enrichment is denied. *Meehan v. Cheltenham Township*, 410 Pa. 446, 189 A.2d 593 (1963); *Bailis v. Reconstruction Finance Corp.*, 128 F.2d 857 (3d Cir. 1942).

Initially, we note that unjust enrichment in the matter before us can only apply to the building of the road, since USG clearly received no benefit from Schiavo's purchase of new equipment. With respect to the road, Schiavo avers that the road benefitted USG by solving the problem of access to Area C, and thus making the property more easily saleable. Schiavo fur-

---

**28.** The land upon which this road was built was owned by the Penn Central Transportation Company. It appears that Schiavo built the road without obtaining any permit to do so from Penn Central.

ther contends that USG's retention of this benefit, without payment to Schiavo for the cost of building the road, is unjust, because USG fraudulently induced Schiavo to build the road by informing Schiavo that there were no immediate plans to sell Area C.

While it is true that USG received some benefit from the building of the road, it is clear beyond peradventure that it is not unjust for USG to retain this benefit. In the *first* instance, USG did not fraudulently induce Schiavo to improve the road; this was entirely Schiavo's own business judgment. While Lamb sought reassurance from USG that the land would not be sold, the response from Starner, on behalf of USG, was far from absolute. There was simply no guarantee given, nor would a reasonable man have interpreted Starner's words as a guarantee. *Second*, the lease contained a clause permitting termination upon 120 days notice. Schiavo, a sophisticated corporation, knew the terms of this lease, and cannot complain that it was legally enforced to its alleged detriment. *Third*, the record shows that no misrepresentation was in fact made; Lamb inquired about potential sale in early 1971, and the road was built at that time; negotiations with Swann did not commence until July or August of that year. Therefore, USG did not mislead Schiavo when Starner informed Lamb that there were no immediate plans to sell the property. *Fourth*, the record shows that Schiavo in fact received full benefit from the road; the road was built to provide access for a landfill operation. When the land was vacated by Schiavo, the land had been brought up to grade, and, therefore, the landfill was completed.

Based upon these findings, we hold that Schiavo has failed to prove a cause of action for unjust enrichment.

### B. Equitable Estoppel:

Under the second head of Schiavo's claim for recovery, Schiavo seeks to apply the doctrine of equitable estoppel. Schiavo contends that USG should be estopped from exercising the right of termination under the lease without compensating Schiavo for the equipment and the road.

The elements of equitable estoppel were succinctly stated by the Supreme Court of Pennsylvania in *Northwestern Nat. Bank v. Commonwealth*, 345 Pa. 192, 27 A.2d 20, 23 (1942):

> Equitable "estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. In this situation, the person inducing the belief in the existence of a certain state of facts is estopped to deny that the state of facts does in truth exist, aver a different or contrary state of facts as existing at the same time, or deny or repudiate his acts, conduct, or statement."

*See also, Blofsen v. Cutaiar*, 460 Pa. 411, 333 A.3d 841 (1975).

■ Again, Schiavo has clearly failed to prove the elements of this cause of action with respect to either the road, or the equipment. *First*, USG made no misrepresentation, since negotiations with Swann did not commence until after Starner's "reassurances" to Lamb. *Second*, Schiavo did not rightfully rely on any representations which were made with respect to potential sale of the land, since the statements were not absolute and contained an obvious disclaimer. Moreover, Schiavo was fully aware of the terms of the lease, including the termination clause. We hold that judgment must be rendered against Schiavo on this cause of action.

### C. Deceit:

■ Finally, Schiavo argues that the actions and misrepresentations of USG constitute a cause of action for the tort of deceit. The elements of this action under the law of Pennsylvania are: 1) a misrepresentation; 2) a fraudulent utterance thereof; 3) an intention that another person will thereby be induced to act, or to refrain from acting; 4) justifiable reliance by the recipient; and 5) damage to the recipient. *Sav-*

*itz v. Weinstein*, 395 Pa. 173, 149 A.2d 110 (1959). *See also, Thomas v. Seaman*, 451 Pa. 347, 304 A.2d 134 (1973).

██ We need go no further than an examination of elements (1) and (4) to find that Schiavo has not proven a cause of action for deceit. We have already determined that USG made no misrepresentation, and in any case, Schiavo did not justifiably rely upon any representation which was made. Judgment must, therefore, be rendered against Schiavo on this final cause of action.[29]

An appropriate order will issue.

---

**29.** Schiavo argues that misrepresentations were also made by USG, through Hansen, at the meeting of December 2, 1971. However, we do not consider this meeting relevant to the issues before us, since by that time, in December of 1971, Schiavo had already purchased the new equipment, and had already built the road.