## Edwin J. Schoettle Co. Appeal.

366

Argued June 4, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Edwin P. Rome,* with him *Blank, Rudenko & Klaus,* for appellant.

*J. B. H. Carter,* with him *David E. Abrahamsen, Pepper, Bodine, Frick, Scheetz & Hamilton* and *Townsend, Elliott & Munson,* for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, October 7, 1957:

This is an appeal from a judgment entered upon an arbitrator's award in a proceeding under the Act of 1927.[1]

In June 1954 the Edwin J. Schoettle Co., a Pennsylvania corporation, and its six subsidiaries were available for purchase. Lester L. Kardon, interested in purchasing the company and five of its subsidiaries, opened negotiations for that purpose. The negotiations extended from June 24, 1954 to September 17, 1954, on which latter date the parties entered into a written agreement under the terms of which Kardon[2] (hereinafter called the buyer) purchased all the issued and

---

[1] Act of April 25, 1927, P. L. 381, No. 248, 5 PS §161, et seq.

[2] Kardon later assigned all his rights under the agreement to a new corporation, Edwin J. Schoettle Company, Inc., and it was this corporation which presented the claim against the escrow fund.

outstanding capital stock of Schoettle Co. and all its subsidiaries (hereinafter called sellers). The total purchase price set forth in the agreement of sale (excluding certain real estate) was $2,100,000 of which amount $187,863.60 was set aside under paragraph 11 of the agreement to be held by the Provident Trust Company of Philadelphia as escrow agent to indemnify the buyer against "the liabilities of sellers by reason of any and all provisions of this agreement."

The present litigation arises from the fact that the buyer has presented a claim against the escrow fund for $69,998.42 as a "liability" of the seller under the agreement. Payment of this claim having been disputed by the sellers, both parties, under the provisions of the agreement, submitted to arbitration and Judge GERALD F. FLOOD was selected as arbitrator. On October 26, 1956 Judge FLOOD, as arbitrator, and, after hearing, awarded to the buyer $3,182.88.³ Buyer's motion to correct the arbitrator's award was dismissed by the Court of Common Pleas No. 6 of Philadelphia County and judgment was entered in the amount of $3,182.88 in conformity with the arbitrator's award. From that judgment this appeal ensued.

The resolution of this controversy depends upon the interpretation of certain portions of the 25-page written agreement of September 17, 1954. The pertinent portions of this agreement are paragraphs 5(g), 9(a), 9(b), 9(c), 10(d) and 15, which read as follows: "5. *Representations and warranties.* Sellers *represent* and *warrant* as follows: [emphasis supplied] . . . (g) *Absence of certain changes.* Since June 30, 1954, there

---

³ The buyer's claim is based largely on the proposition that sellers had warranted the company's net worth. The amount allowed by the arbitrator—$3,182.88—represented an error in computing state taxes, additional taxes and water rent. This amount is undisputed as a proper claim against the fund.

have not been (i) any changes in Company's or its subsidiaries' financial condition, assets, liabilities, or businesses, other than changes in the ordinary course of business, none of which have been materially adverse, and changes required or permitted hereunder; (ii) any damage, destruction, or loss, whether or not covered by insurance, materially and adversely affecting the properties or businesses of Company and its subsidiaries as an entirety; (iii) any declaration, or setting aside, or payment of any dividend or other distribution in respect of Company's capital stock or that of any subsidiary (except that prior to the date hereof, Company has declared and paid a dividend of Sixteen and Two Thirds Cents ($.16 2/3) per share on all issued and outstanding shares of its said capital stock), or any direct or indirect redemption, purchase, or other acquisition of any such stock; or (iv) any increase in the compensation payable or to become payable by Company or any subsidiary to any of their officers, employees, or agents, or any bonus payment or arrangement made to or with any of them.

. . . .

"9. *Conditions precedent.* All obligations of Buyer under this agreement are subject to the fulfillment, prior to or at the closing of each of the following *conditions*: [emphasis supplied]. (a) *Financial condition at closing.* As of the time of closing the financial condition of the Company and its subsidiaries in the aggregate shall be no less favorable than the financial condition shown on the statements of said corporations dated June 30, 1954 and warranted to be true and complete in paragraph 5(e) hereof. (b) *Representations and warranties true at closing.* Sellers' representations and warranties contained in this agreement shall be true at the time of closing as though such representations and warranties were made at such time. (c) *Per-*

*formance.* Sellers shall have performed and complied with all agreements and conditions required by this agreement to be performed or complied with by them prior to or at the closing.

. . . .

"10. *Indemnification.* Sellers shall indemnify and hold harmless Buyer, subject to the limitations of paragraph 11 hereof, against and in respect of: . . . (d) any damage or deficiency resulting from any misrepresentation, breach of warranty, or nonfulfillment of any agreement on the part of Sellers, or any of them, under this agreement, or from any misrepresentation in or omission from any certificate or other instrument furnished or to be furnished to Buyer hereunder;

. . . .

"15. *Survival of representations.* All representations, warranties and agreements made by Sellers and Buyer in this agreement or pursuant hereto shall survive closing, subject to the provisions of paragraph 11 hereof."

The buyer (appellant) contends that the financial condition on the date of purchase—September 17, 1954 —was less favorable than that reflected in the company's financial statement of June 30, 1954 and, therefore, he is entitled to reimbursement out of the escrow fund for the amount of the deficiency. Sellers (appellees) deny any reduction in the financial condition and further argue that, even if there were any reduction, buyer has no right to reimbursement under the agreement unless such reduction resulted from occurrences outside the ordinary course of business or which caused a materially adverse change in the company's financial condition. Actually the buyer's position is that paragraph 9(a), supra, constituted a "warranty" on the sellers' part that the financial condition of the company and its subsidiaries was not less favorable than

demonstrated by the financial statement of June 30, 1954 and, therefore, sellers having breached the warranty the buyer is entitled to claim the difference between the net worth on June 30, 1954 and September 17, 1954. On the other hand, sellers take the position that their engagement under paragraph 9(a) constituted a "condition" and not a warranty and the buyer had simply the right to refuse a consummation of the sale if the "condition" was not fulfilled; when the buyer elected to consummate the sale it waived the "condition."

At the hearing before the arbitrator the buyer introduced certain evidence for the purpose of proving that it was the parties' intent that the sellers would warrant that the financial condition of the company and its subsidiaries would be no less favorable on the date of closing than on June 30, 1954. Such evidence consisted of the original letter opening negotiations, a memorandum prepared by the Provident Trust Company acting for the sellers, an interim draft of a proposed form of agreement containing interlineations and marginal notations made by one of buyer's counsel, an accountant's calculation reflecting the condition of the company and its subsidiaries from June 30 to the date of closing, together with an itemization of buyer's claim and accountant's report showing the financial condition of the company on June 30, 1954 and September 17, 1954. The buyer urges that a proper interpretation of this agreement requires a consideration of all this evidence in order to ascertain the parties' intent.

In interpreting this agreement it is our duty to attempt to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles: *Foulke v. Miller,* 381 Pa. 587, 112 A. 2d 124; *Silverstein v. Hornick,* 376 Pa. 536, 103 A. 2d 734; *Betterman v. American Stores Company,*

367 Pa. 193, 203, 80 A. 2d 66; *Price v. Confair*, 366 Pa. 538, 79 A. 2d 224; *Percy A. Brown & Co. v. Raub et al.*, 357 Pa. 271, 287, 54 A. 2d 35. In order to ascertain that intention "the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement": *Hindman v. Farren et al.*, 353 Pa. 33, 35, 44 A. 2d 241; *Betterman v. American Stores Co.*, supra, p. 204. However, that does not mean that where there is an integrated agreement—"where the parties thereto adopt a writing or writings as the final and complete expression of the agreement"[4]—evidence of the negotiations which have led to the formation of this integrated agreement is admissible to show an intent at variance with the language of the written agreement; such evidence is admissible only to prove "that the parties were dealing in regard to a matter or to secure an object, or under circumstances where local usage would give a particular meaning to the language; or in case the local meaning is ambiguous, to show that the parties attached one appropriate meaning to their words, rather than another equally appropriate meaning": Williston on Contracts, (Revised Ed.), Vol. 3, §630, p. 1809; *Hollander et al. v. Friedman*, 360 Pa. 20, 59 A. 2d 892; *McMillin v. Titus*, 222 Pa. 500, 503, 72 A. 240; Restatement of the Law of Contracts, §238(a).

The language of the instant agreement is clear and unambiguous. The buyer's evidence would tend to prove that in the negotiations leading up to the integrated agreement it was intended that the sellers warrant the company's and its subsidiaries' financial condition, whereas the language of the agreement plainly expresses a contrary intent. The admission of such

---

[4] Restatement of the Law of Contracts, §228.

evidence would vary and change the language of the agreement and its exclusion was eminently proper under the circumstances.

This written agreement was carefully and meticulously prepared by able and competent counsel after long and thorough negotiations. Each general paragraph of the agreement is headed by a title descriptive of the contents of each paragraph. Paragraph 5, entitled "Representations and Warranties", expressly states that the sellers "represented and warranted" fifteen separate and carefully spelled out factual situations. Paragraph 9, entitled "Conditions precedent" expressly states that "All obligations of buyer under this agreement are subject to the fulfillment, prior to or at the closing, of each of the following *conditions.*" It is to be noted that included among the *"conditions"* was the financial condition of the company and its subsidiaries at the time of closing, that the fulfillment of the "conditions" was to take place not subsequent to but "prior to or at the closing" and that the buyer's obligations, not the sellers', were made subject to the fulfillment of the condition. This agreement, in distinct and indubitable language, distinguishes between such engagements on the sellers' part as constitute "Warranties" and such engagements as constitute "Conditions".

Assuming, arguendo, that the company and its subsidiaries' financial condition was less favorable on September 17, 1954 than the financial condition shown on the statement dated June 30, 1954, what under this agreement was the buyer's remedy? The buyer claims that such fact constituted a breach of warranty which gave to him the right to recover the amount of the reduced net worth, while the sellers claim that the buyer had the choice on September 17, 1954 either to accept

the situation or to refuse to proceed under the agreement.

The buyer argues that it was impossible to ascertain at the date of closing whether or not the net worth of the company and its subsidiaries had been reduced, and that only by an examination after date of closing could this fact be ascertained and, therefore, both parties must have intended that the buyer have a reasonable time after the date of closing to ascertain this fact. Such an argument not only finds no support in the wording of the agreement but, on the contrary, is in direct conflict with the express terms of the agreement. Such a contention would require that we read into the agreement that which is in direct variance with the clear and unambiguous language employed to express the parties' intent.

Neither The Sales Act of 1915[5] nor the Uniform Commercial Code—Sales Article[6]—is applicable to this situation. The former legislation was repealed as of July 1, 1954 and this agreement was not executed until September 17, 1954. Under the Uniform Commercial Code —Sales, "investment securities"—that which was purchased and sold under this agreement—are expressly excluded. Comment 1 thereunder provides, inter alia: " 'Investment securities' are expressly excluded from the coverage of this Article. It is not intended by this exclusion, however, to prevent the application of a particular section of this Article by analogy to securities . . . when the reason of that section makes such application sensible and the situation involved is not covered by the Article of this Act dealing specifically with said securities (Art. 8)." Article 8 deals with the issue, purchase and registration of investment securities.

[5] Act of May 19, 1915, P. L. 543, 69 PS §1 et seq.

[6] Act of April 6, 1953, P. L. 3, 12A PS §2-101 et seq.

The buyer urges that §2-714, §2-717 and §2-720 of the Code gave him the right to recoup damages from the sellers even though it may have waived its right to rescind the contract. The arbitrator's answer to this contention is fully justified: "But this likewise does not apply to this contract. If A promises to deliver to B 1300 shares of A Co. stock but delivers only 1200 shares there is no injustice in allowing B to take the 1200 and sue for damages. But if A promises to deliver 1300 shares at a certain price, and B promises to pay a certain price for them, but the contract provides that B need not perform if the market price is lower than the sale price on the delivery date, there is no basis in law or justice in allowing B to take the shares and sue for the difference between sale price and market price. This is precisely the situation before me, and nothing in the Sales Act, the Uniform Commercial Code, or any of the cases cited lead to a different result from that which I have reached." In addition thereto, the instant situation does not call for the application of Article 2 to the sale and purchase of shares of capital stock.

In determining this controversy we have no need to draw a distinction between "warranties" and "conditions" generally—a field in which there is great confusion.[7] The parties themselves to this agreement have

---

[7] Lord Abinger in *Chanter v. Hopkins*, 4 M. & W. 399, has said: "Two things have been confounded together. A warranty is an express or implied statement of something which the party undertakes shall be part of a contract; and though part of the contract, yet collateral to the express object of it. But in many of the cases, some of which have been referred to, the circumstances of a party selling a particular thing by its proper description, has been called a warranty; and the breach of such contract, a breach of warranty; but it would be better to distinguish such cases as a non-compliance with a contract which a party has engaged to fulfill; as, if a man offers to buy peas of another, and he sends him beans, he

by its express terms drawn a clear distinction between the sellers' obligations in the nature of warranties and their obligations in the nature of conditions and among the latter have included the financial condition of the company and its subsidiaries. Sellers made no representation or warranty concerning the financial condition.

The buyer's next contention very properly has been dismissed by Judge FLOOD in the following language: "He then argues that the failure of a party to perform a condition may be treated as a warranty, allowing the other party to accept the defective performance and sue for the breach, citing Section 11 of the Sales Act.

"However, Section 11 provides only that a condition may be treated as a warranty if the condition is also a promise. The language is: " 'Where the obligation of either party to a contract to sell or a sale is subject to any condition which is not performed, such party may refuse to proceed with the contract or sale or he may waive performance of the condition. If the other party has promised that the condition should happen or be performed, such first-mentioned party may also treat the non-performance of the condition as a breach of warranty.'

"The condition in Paragraph 9 (a) is not a promise. It is something that might have been outside sellers' control. It is merely a statement that if a certain state

does not perform his contract; but that is not a warranty: there is no warranty that he should sell him peas; the contract is to sell peas, and if he sells him any thing else in their stead, it is a non-performance of it. So, if a man were to order copper for sheathing ships—that is a particular copper, prepared in a particular manner; if the seller sends him a different sort, in that case he does not comply with the contract: and though this may have been considered a warranty, and may have been ranged under the class of cases relating to warranties, yet, it is not properly so . . .".

of facts does not exist at the time of settlement, the buyer is not obligated to perform, not a promise by the seller that they shall exist. The warranty language of Paragraph 5(g) is very different and constitutes a legally binding promise.

"Nothing in either of the citations to Corbin or Williston in buyer's brief covers the right to accept performance and sue for a breach of condition unless that condition is either a promise to do something or a representation of fact. The representations and warranties in this contract are set forth and labelled in Paragraph 5, and referred to and made conditions as well in 9(b). The converse is not true as to the condition in 9(a), and the contract is pointed up by its proximity to 9(b). . . .

". . . If the statement of June 30 had been incorrect to buyer's detriment or the agreements referred to in 9(c) had not been carried out, buyer had the right to complete the purchase and recover for breach of warranty. Upon breach of a mere condition, not constituting a promise or representation, he is limited to calling off the deal and getting his deposit back. All the cases and authorities cited by the buyer indicate that a condition will not be construed as a warranty unless the condition is a promise or at least a representation of fact. The condition in 9(a) is neither and does not survive the closing under clause 15 or give the buyer a right to recover from the escrow fund.

"Not only is there no promise to perform this condition found anywhere in the contract, but there is a promise in 5(g) covering the same general ground but promising somewhat less than the performance of the condition. This promise would be totally useless and meaningless if I were to imply an unexpressed promise to do all that is expressly promised and something more. Contracts are not so construed. The clear and

precise language of the promise in clause 5(g) prevents me from doing what buyer asks me to do, i.e., not to interpret, but to rewrite the contract in the light of the preliminary negotiations."

The arbitrator concluded that to construe paragraph 9(a) as creative of a promise for the breach of which the buyer could recover damages—i.e., a warranty— would be inconsistent with paragraph 5(g). With this conclusion we are in full agreement. The sellers in paragraph 5(g) represented and warranted, inter alia, that there had not been any changes in the financial condition of the company or its subsidiaries other than changes in the ordinary course of business, none of which had been materially adverse and were changes required or permitted under the agreement. Paragraph 9(a) covers an entirely different situation in that it referred to such changes in the financial condition of the company and its subsidiaries in the ordinary course of business which were materially adverse and not permitted under the agreement; if this situation arose the agreement specifically provided that the buyer was under no obligation to complete the purchase. A comparison of paragraph 5(g) with paragraph 9(a) clearly leads to this conclusion; to place upon paragraph 9(a) any other construction than that placed upon it by the arbitrator would amount to a redundancy.

A resolution of the instant controversy depends entirely upon an interpretation of the language of this agreement. The language employed by the parties is manifestly indicative of that which was intended and the meaning of the agreement—free as it is of ambiguity and doubt—is to be determined by what the agreement states. The parties carefully and scrupulously delineated between the sellers' undertakings which were intended to be "warranties" and those which were intended to be "conditions". It is crystal clear that the

undertaking under paragraph 9(a) was simply a "condition" and not a "warranty" and once the buyer elected to accept this agreement the provisions of paragraph 9(a) ceased to be operative and the buyer had no right to recover any damages.

The judgment of the Court below is affirmed. Costs to be paid by appellant.

Mr. Justice BELL and Mr. Justice COHEN dissent.