**RAGNAR BENSON, INC., Plaintiff,**

v.

**BECHTEL POWER CORPORATION, Defendant.**

Civ. No. 83–1084.

United States District Court, M.D. Pennsylvania.

Dec. 31, 1986.

Robert W. Barton, Killian & Gephart, Harrisburg, Pa., Joseph W. Conway, Sarver, Pa., for plaintiff.

Robert P. Casey, Thomas L. Vanaskie, Dilworth, Paxson, Kalish & Kauffman, Scranton, Pa., for defendant.

## MEMORANDUM

HERMAN, District Judge.

## I. INTRODUCTION

This case is a contract dispute involving the construction of the Limerick Nuclear Generating Station (Limerick). Bechtel Power Corporation (Bechtel), the defendant in this suit, was the general contractor hired by Philadelphia Electric Company to construct the generating station. In December, 1970, Bechtel entered into a contract with Ragnar Benson, Inc. whereby Ragnar Benson agreed to construct the concrete cooling towers for the plant.

During the course of construction, and before construction actually began, Bechtel and Ragnar Benson encountered a series of delays, labor slow downs, changes to the proposed method of work, and other cost-escalating factors. Many amendments to the subcontract were executed in an attempt to address these problems and to fully compensate Ragnar Benson for its work while at the same time ensuring timely completion of the project. The disputes in this case arise out of a series of these amendments and principally involve the issue of the correct amount of compensation due Ragnar Benson for its work in constructing the concrete shells for the cooling towers.

Nearly two weeks of testimony has been taken on the factual issues of this case, the legal issues have been fully briefed and the case is ripe for decision.

## II. FACTUAL BACKGROUND

One of the principal components of the work performed by Ragnar Benson pursuant to its subcontract with Bechtel was the erection of the concrete shells for each of the two cooling towers at Limerick. These shells are the hyperbolic-shaped structures through which air is drawn to cool the water used to turn the power plant turbines. In order to construct these shells,

964

the subcontract specifications required Ragnar Benson to pour successive rings, or "lifts", of reinforced concrete, one on top of the other. Before each successive lift of concrete could be poured, the specifications directed Ragnar Benson to remove a thin layer of concrete from the top of the previous pour. This thin layer of concrete is known as laitance. Laitance must be removed in order to achieve a proper bond between the successive layers of concrete. Ragnar Benson proposed in its bid for the subcontract to clean these horizontal joints between the layers of concrete by scrubbing the joints with a wire brush immediately after the concrete had been poured.

In June, 1978, after a prolonged delay in the start of construction, Bechtel and Ragnar Benson executed the first of the subcontract amendments with which we are here concerned. Amendment No. 7 (Defendant's exhibit 9) updated the subcontract terms by adding paragraph H governing "Changes and Extra Work" to the "Special Provisions" section of the contract. Paragraph H defined a "change" as "a substitution for, an addition to, or deletion of, any work or other requirement the performance of or compliance with which is contemplated by the Subcontract." "Extra Work" was. defined as "the performance of any work or compliance with any requirement which is not contemplated by the Subcontract." Paragraph H gave to Bechtel, as the contractor, the power to, at any time, "make changes and ... request the Subcontractor to perform extra work." Changes or requests for extra work were to be in writing. Upon receipt of the written orders, Ragnar Benson, as the subcontractor, agreed to submit in writing within ten days, "a proposal for accomplishing such work, which proposal shall reflect the increase or decrease, if any, in cost to the Subcontractor of performing work under the Subcontract in comparison to what the

cost would have been, had such work not been ordered." In the absence of such a proposal, compensation was to be calculated on a "cost-plus" basis.

Also in June, 1978, prior to commencement of the cooling tower shell construction, Bechtel concluded that the wire brush method of cleaning construction joints proposed by Ragnar Benson would not be adequate to insure the structural integrity of the cooling towers. By letter of June 22, 1978, Bechtel solicited a proposal to clean the horizontal construction joints by water blasting or air-water cutting. Defendant's exhibit 29. On July 31, 1978, Ragnar Benson submitted its initial proposal for cleaning the joints in accordance with Bechtel's requirements. The letter by which Ragnar Benson submitted its proposal stated "we offer the following proposal to *treat* the horizontal construction joints in the tower shells in accordance with Addendum 1 to Revision 2 of Specification M–9, paragraph 5.2" yet the letter clearly referred to Bechtel's letter soliciting a proposal for "water blasting or air-water cutting of the horizontal joints in the shell of the cooling towers." *See* Defendant's exhibits 31 and 29. Beginning with these two letters, Bechtel and Ragnar Benson consistently, in their course of dealing with each other, referred to the process used to remove laitance as "treatment" of the horizontal construction joints, rather than as "cleaning" of the joints, despite the language of the technical specifications.[1]

Bechtel and Ragnar Benson engaged in a series of negotiations from August, 1978, through March, 1979, in an attempt to agree on a basis for compensation for the revised method of cleaning or "treating" the horizontal construction joints. The negotiations culminated in Subcontract Amendment No. 25. Amendment 25 re-

---

1. Ragnar Benson attempts to make the argument that "treatment" of the joints as used in some of the contract documents refers solely to the placement of grout before the beginning of a pour. Ragnar Benson claims that the term "treatment" does not also include the process by which laitance was removed prior to each suc-

cessive pour. Defendant's exhibits 29 and 31 demonstrate the clear fallacy of this argument. We find that Ragnar Benson and Bechtel *both* understood the term "treatment" to include the removal of laitance by water blasting or air-water cutting.

quired Ragnar Benson to "[f]urnish all labor, materials, equipment, and supervisions required to treat the horizontal construction joints in the cooling tower shell in accordance with Addendum 1 to Revision 3 of the Specification 8031–M–9B," and provided for a lump sum payment in the amount of $552,358.00. This payment was expressly conditioned on the use of a nine person crew to perform the work. The amendment provided that, in the event the size of the crew varied, "the cost of the work will be adjusted (either add or deduct) by a subsequent amendment."

Construction of the shell for Cooling Tower No. 1 began in July of 1979. Ragnar Benson employed a second shift, nine member crew to clean the construction joints. Ragnar Benson used a second-shift crew for the cleaning work because the joint could only be hydroblasted when the concrete had attained a sufficiently hard set that the hydroblaster would not remove large portions of the prior pour. Furthermore, Ragnar Benson could not allow the concrete to set overnight, before hydroblasting, because the concrete would become too hard and the laitance could not be removed. The second shift often worked overtime to complete the hydroblasting operation because the operation could not commence until the concrete had attained the proper set, often hours after the concrete had been poured, and hours after the second shift had arrived on the construction site.

At the conclusion of the 1979 construction season, Ragnar Benson had expended over 50% of its estimated manhours for unit 1 joint cleaning work, yet it had only completed construction of 30% of the lifts. Of the 8,230 manhours expended on the joint cleaning work, 1,359.5 manhours were overtime hours.

By letter of November 21, 1979 on the subject of "Shell Horizontal Joint Treatment, Amendment No. 25," Ragnar Benson requested compensation for the overtime manhours incurred in cleaning the shell joints during 1979. *See* Defendant's exhibit 50. In a meeting on November 29, 1979,

Ragnar Benson informally stated that "they are confronted with many different problems in constructing the Limerick towers and, as a result, much more money will now be required to complete the work as scheduled." At the end of the meeting, Wayne Messer, Vice-President of Ragnar Benson, agreed to "specifically and formally" define the additional costs facing Ragnar Benson and the "participation" in those costs sought from other parties. Plaintiff's exhibit 20.

On January 4, 1980, Ragnar Benson submitted its first proposal for additional compensation for Tower No. 1 shell work. Ragnar Benson estimated that it would require 29,000 regular manhours in excess of its original estimate of 94,000 manhours, as well as 3,230 excess overtime manhours in order to complete the tower shell on schedule. Defendant's exhibit 51. A series of meetings and letters followed this first formal proposal. Finally, in March, 1980, the parties executed a Memorandum of Understanding providing for additional compensation for Ragnar Benson for shell number 1 construction work. This Memorandum contained the proviso:

> [t]his memorandum is predicated on the preparations [sic] of an amendment to S/C No. 8031–M–9B which will incorporate the items listed below and will be of no effect unless and until fully approved by Philadelphia Electric Co. and said Subcontract Amendment has been fully executed by both BPC and RBI.

Defendant's exhibit 62.

The agreement embodied in the Memorandum of Understanding was made a part of the subcontract by amendment 38. Defendant's exhibit 67. Amendment 38 provided that Ragnar Benson was to be compensated an additional $632,836.90 for "additional Cooling Tower No. 1 shell labor costs," and an additional $114,235.10 for "additional costs incurred (beyond the scope of Amendment No. 25) to treat the Cooling Tower No. 1 shell horizontal construction joints." *Id.* The additional compensation was to be paid to Ragnar Benson on a lump sum, incentive basis. In other

words, the amendment set out six "Milestone" dates by which times certain definable amounts of work were to be completed. If Ragnar Benson completed each segment of work on schedule, Bechtel would compensate it for each block of work by paying it a stipulated lump sum. In exchange for the additional compensation, Ragnar Benson agreed

> that the arrangement set forth in this Amendment No. 38 fully compensates Subcontractor for the scope of work described herein and that no additional claim for compensation for any cause relating to this subject will be made in connection with this Subcontract.

*Id.* at 3. The parties executed Amendment 38 sometime in early August 1980.

After the parties agreed to the substance of amendment 38 in March, 1980, Ragnar Benson continued to encounter difficulty in maintaining its completion schedule, and continued to expend an excessive number of manhours to obtain a satisfactory horizontal joint between layers of concrete. In late May of 1980, Ragnar Benson decided to test a retardant to assist in the cleaning of the construction joints. It was hoped that the retardant, applied to the surface of the pour shortly after it was completed, would slow the hardening of the surface of the concrete so that the laitance would be easier to remove and the cleaning of the joints would no longer require the use of night shifts.

As a result of the successful test application of the retardant, Ragnar Benson requested that the necessary paperwork be processed so that it could use the retardant to facilitate the shell joint cleaning operation. Defendant's exhibit 72. Under the terms of the subcontract and the technical specifications, Ragnar Benson could not use a retardant to assist in cleaning the shell joints without first obtaining Bechtel's approval.[2] Bechtel field personnel issued Field Change Request M5443-F on June 3, 1980, requesting a specification change to allow the use of the proposed retardant compound. Defendant's exhibit 73. The Field Change Request was approved on June 9, 1980, by Philadelphia Electric Company and Bechtel's engineering department, and became Addition 1 to Specification M-9, Revision 4 on that date.

Ragnar Benson began using the retardant on June 11, 1980. Although cost and labor savings were not immediately apparent, Ragnar Benson was able to discontinue its second shift joint cleaning operation by June 25, 1980. As a result of the use of the retardant, Ragnar Benson laid off three cement finishers, two operating engineers, and one master mechanic from its joint cleaning crew. The time required to clean a construction joint was reduced from sixteen hours to three to four hours by July, 1980. Ragnar Benson itself admits that the use of the retardant resulted in "substantially less manhours [for construction joint cleaning] than had been expended prior to use of the retardant." Defendant's Request for Admission No. 127, N.T. 733.

In late June of 1980, when it became clear that use of the retardant was resulting in cost savings to Ragnar Benson, Wybranski, Bechtel's lead subcontract engineer on the project, advised Ragnar Benson that Bechtel might be seeking a credit for the cost savings experienced. N.T. 631–632. In late August, Wybranski again informed Ragnar Benson personnel "that Bechtel might be looking for a credit from RBI for changing the specifications to permit the use of a concrete retardant on shell horiz. constr. joints [sic]." Defendant's exhibit 81.

Just over two months later, Bechtel issued Change Notice 25-D, dated November 7, 1980. This change notice formally transmitted the specification addition permitting use of the retardant that had taken effect on June 9, 1980. This specification addition was transmitted along with several other changes to the specifications. The trans-

---

**2.** *See* Defendant's Request for Admission No. 48, N.T. 734; N.T. 443, 554–55, 591–92, 800, 856–857, 1114–1116; Bratchie Deposition at 40; Mandich Deposition at 27–29; Bowermaster Deposition at 158–60.

mittal letter accompanying Change Notice 25–D specifically requested Ragnar Benson to "advise if any of the revisions made by the enclosed Change Notice will result in the submission of new or revised proposals by the Subcontractor." Further, the Change Notice itself stated "[t]he subcontractor is requested to review these documents and advise the Project Construction Manager, in writing, of any changes affecting the Subcontract schedule or cost." Defendant's exhibit 75.

On November 18, 1980, Ragnar Benson executed the Change Notice and returned it to Bechtel with the notation, "[a]cknowledge receipt only. Any changes affecting [sic] cost will be submitted at a later date." Ragnar Benson never did submit any information to Bechtel concerning the cost savings resulting from use of the retardant.

No further communications were had between Bechtel and Ragnar Benson on the subject of the credit until December 16, 1982. At an "open item review" meeting held on that date, Bechtel raised the subject of a credit for the cost savings resulting from the changed specifications and the use of the retardant. Defendant's exhibit 83. At a second meeting held on January 13, 1983, Bechtel again raised the issue and Ragnar Benson took the position that no credit was due because "Amendment No. 38 was the final settlement of the cost of shell joint treatment." Defendant's exhibit 84. By letter of January 18, 1983, Bechtel formally requested a credit of $116,888.49 for manhours saved in the treatment of Tower No. 2 shell horizontal construction joints as a result of the use of the retardant. Ragnar Benson replied on January 27, 1983, disputed Bechtel's entitlement to the credit, and threatened to make a claim for an overrun of 29,213 manhours beyond the estimated 126,000 manhours necessary to construct the Tower No. 1 shell. Defendant's exhibit 87.

Further meetings and communications between Bechtel and Ragnar Benson failed to resolve the dispute. Finally, Bechtel, relying on paragraph 24 of the General Terms and Conditions of the subcontract,

withheld payment on Ragnar Benson invoices totalling $182,932.45, and applied that sum toward its claim for overpayments for joint cleaning work. Defendant's exhibit 7 and N.T. 22. On August 2, 1983, Ragnar Benson filed its complaint in this action seeking payment of the withheld sums. Bechtel responded to this complaint with an Answer and Counterclaim in which Bechtel denied owing the retained amounts and further counterclaimed that Ragnar Benson owes Bechtel the difference between the amount retained and the cost savings enjoyed by Ragnar Benson as a result of the use of the retardant. Ragnar Benson then filed an amended complaint seeking compensation for the manhour overruns it experienced in constructing cooling tower number two.

### III. DISCUSSION

There are three main claims in this case. The first is Ragnar Benson's claim for payment of the amounts retained by Bechtel and applied to Bechtel's claim for a credit. Neither party seriously disputes that this retained sum of $182,932.45 is owed to Ragnar Benson for work satisfactorily performed. The only issue concerning this amount is whether Bechtel was justified in retaining it and applying it towards its claim against Ragnar Benson.

The second claim is Bechtel's claim for a credit and the third is Ragnar Benson's claim for compensation for manhour overruns. Because Ragnar Benson's recovery of the retained $182,932.45 depends on the outcome of the second and third claims, we will address these first.

### A. *Bechtel's Claim for a Credit*

Bechtel's claim for a credit is based on two contract theories and one restitution theory. Its first theory is that the use of the retardant amounted to a "change" within the meaning of amendment 7 to the contract. Amendment 7 provided that, whenever there is a change that causes an increase or decrease in the cost of performing the work, there was to be an adjust-

ment in the compensation owed the subcontractor for that work.

Bechtel argues, under this first theory, that the specification change of June 9, 1980, that allowed Ragnar Benson to use a retardant to assist in cleaning the construction joints was a change within the meaning of amendment 7. Amendment 7 defines a change as a "substitution for, an addition to, or deletion of, any work or other requirement the performance of or compliance with which is contemplated by the subcontract." According to Bechtel, the use of the retardant in accordance with the specification change was an addition to the contractual requirement that Ragnar Benson clean the construction joints by waterblasting or air-water cutting. In this case, the addition resulted in a decrease in the cost of performing the work. Pursuant to the terms of the amendment, therefore, Bechtel argues that it should be entitled to a decrease in the compensation owing Ragnar Benson.[3]

Ragnar Benson, on the other hand, principally argues that Bechtel is not entitled to recover any amounts pursuant to amendment 7 because, in its view, there was no "change." It also argues that Bechtel at no time *required* Ragnar Benson to use the retardant, and that there were no "written orders" to trigger the cost recalculation provisions of amendment 7.

Ragnar Benson's argument that there was no "change" is based on its contention that it was unnecessary to revise the specifications to permit use of a retardant. Ragnar Benson argues that the specifications issued in the early 1970's, long before construction actually began, expressly prohibited the use of a retardant. Later, this express prohibition was removed from the language of the specifications. According to Ragnar Benson, the deletion of the express prohibition means that the use of the retardant was permitted and no specification change was needed.

■ Ragnar Benson's argument that there was no change within the meaning of amendment 7 fails for several reasons. First, the clear and unambiguous definition of "change" in amendment 7 does not require a revision in the specifications for an additional work item to constitute a change. All that is required is "an addition to ... any work or other requirement the performance of ... which is contemplated by the Subcontract." Not only was application of the retardant an additional step in the joint cleaning process, it was a step both Bechtel and Ragnar Benson contemplated would be performed throughout the remainder of the project. Further, Ragnar Benson itself acknowledged that it "could not use a retardant to assist cleaning the shell horizontal construction joints without first obtaining the approval of Bechtel." Defendant's Request for Admissions 48, N.T. 734. The facts that Bechtel's permission was necessary, and that the parties both contemplated use of the retardant throughout the remainder of the project indicate that there *was* a change in the work that was more than a permissive use by the contractor of a different tool to accomplish the same result. The evidence indicates that both parties viewed the use

---

**3.** The precise terms of the amendment are as follows:

Unless otherwise required, the Subcontractor shall, within ten (10) calendar days following receipt of such written orders, submit in writing to the Contractor a proposal for accomplishing such work, which proposal shall reflect the increase or decrease, if any, in cost to the Subcontractor of performing work under the Subcontract in comparison to what the cost would have been, had such work not been ordered. The proposal shall state the basis of compensation for the [work] involved in the Change or Extra Work, or if the change causes a decrease in the cost of performing work under the Subcontract, the amount of such decrease shall be stated. Sufficient detail shall be given in the proposal to permit thorough analysis of the proposal. The basis for compensation shall be one of those set forth below which are listed in order of preference; Provided that if Subcontractor does not propose the method of compensation for such work or any part thereof, or if any proposed method is not acceptable or if a method of compensation for such work, or any part thereof cannot be agreed upon, Subcontractor shall proceed with such work and compensation therefore will be made on a cost-plus basis as set forth in item (c) below.

of the retardant as a significant change in the method used to clean the joints and that, as a result of its use, the performance of the cleaning operation was significantly altered.

Second, a change in the specifications governing the cleaning operation was indeed necessary. The Bechtel specifications set forth in detail the procedures and processes Ragnar Benson was required to use to accomplish its job. N.T. 704. Only materials explicitly approved by the specifications could be used, and the absence of approval in the specifications was a clear indication that the use of the chemical retardant was not allowed absent a change in the specifications. N.T. 800, 856–57, 1113–1114, Bratchie Deposition at 40; Mandich Deposition at 28. Even Boris Mandich, Ragnar Benson's on-site project manager acknowledged that express approval of the retardant was necessary before Ragnar Benson could begin application:

> The nature of the job being nuclear and requiring documentation of everything chemically used on the project, most certainly would require approval by the Bechtel Corporation and the Marley Corporation for any item used on that project that was part of the construction.... So that all parties involved would have approved the use of an item so that if that item caused any damage in the future, that all parties could not say that it was not approved by all for use.

Mandich deposition at 28.

■ Ragnar Benson's next argument against the applicability of the amendment 7 change provisions to this case is that Bechtel at no time *required* Ragnar Benson to use the retardant and at no time issued "written orders" to Ragnar Benson concerning the use of the retardant. This argument ignores two important facts. First, it is uncontroverted that *Ragnar Benson*, rather than Bechtel, requested the change. Second, although no formal change order was issued until November, 1980, there were at least three writings adopted by the parties that evidence the request for the change and the change

itself. In a June 3, 1980 letter to Marley Cooling Tower Company, the design company through which Ragnar Benson obtained the subcontract to construct the towers, Ragnar Benson clearly requested that Marley "initiate the necessary paperwork" so that Ragnar Benson could begin using the retardant on June 9, 1980. Defendant's exhibit 72. It is the undisputed testimony of Dirk Van Luling, Bechtel's subcontract engineer, that, around this same time, Boris Mandich, Ragnar Benson's project manager, approached him and orally requested that the specifications be changed so that Ragnar Benson could use a chemical retardant. Van Luling advised Mandich:

> Marley had to first get involved with the changing of design, and this was a design item. And so I suggested that he go through Mike Alexander of Marley, the Marley field representative, and that Marley needs to generate what they call a JDR, job disposition report. That would form the catalysis [sic] for my initiating a Bechtel in-house document to get our specification change.

N.T. 790. Marley did in fact issue a jobsite disposition report (defendant's exhibit 74) on June 10, 1980, noting that "Ragnar Benson has requested to prepare construction joints with ... retarder in lieu of hydroblasting," and indicating its approval of the request. Simultaneously with the processing and issuance of Marley's approval, Bechtel began the process of changing its specifications. This process resulted in the approval on June 9, 1980, of the specification change. *See* N.T. 791 and defendant's exhibit 73. Immediately upon receipt of both approvals, Ragnar Benson began application of the retardant. Defendant's exhibit 388.101.

We find that Ragnar Benson's written request to Marley, Marley's written request to Bechtel, and Bechtel's written Field Change Request noting the official approvals of the specification change satisfy the requirement of a writing contained in the amendment 7 change provisions. The fact that the change was requested by Ragnar Benson explains why there was no

immediate formal "order" to the subcontractor, and does not defeat the applicability of amendment 7. Bechtel did, in fact, issue a formal order on November 7, 1980, and noted in the accompanying letter, that "through ongoing discussions and correspondence, the Subcontractor has been kept apprised of many of the changes described in the attached revised documents. Bechtel's intent in forwarding this information by Change Notice No. 25–D is to update the subcontract documents." Defendant's exhibit 75.

Because we find that the use of a retardant was a written change within the meaning of amendment 7, we hold that the cost adjustment provisions of the amendment were triggered and would entitle Bechtel to a credit for the cost saved by the use of the retardant in the absence of a waiver of that entitlement. Ragnar Benson argues that there has been such a waiver based on the language of Change Notice 25–D and the fact that Bechtel executed amendment 38 after it was aware of the cost savings experienced as a result of the use of the retardant.

In order for there to be a waiver of a legal right under Pennsylvania law, " 'there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it ...' *Brown v. City of Pittsburgh*, 409 Pa. 357, 360, 186 A.2d 399, 401 (1962)." *Van Riper v. Equitable Life Assurance Society*, 561 F.Supp. 26, 34 (E.D.Pa.1982), aff'd mem., 707 F.2d 1397 (3d Cir.1983). *See also, Envirex, Inc. v. Ecological Recovery Associates*, 454 F.Supp. 1329 (M.D. Pa.1978), aff'd mem., 601 F.2d 574 (3d Cir. 1979) ("The Supreme Court of Pennsylvania has stated that to make proof of a waiver of a legal right there must be clear, unequivocal, and decisive action of the party having such right showing a purpose to surrender such right on his part.").

■ Ragnar Benson argues that the issuance of change notice 25–D and the execution of amendment 38 are "clear, unequivocal and decisive acts" sufficient to amount to a waiver of Bechtel's claim for a credit. We disagree. Change notice 25–D, the notice that formally transmitted the specifications allowing use of the retardant to Ragnar Benson (defendant's exhibit 75), admittedly has X's in the boxes next to the phrases "no change in price authorized" and "proposal not required." Absent any qualification, these phrases might amount to a waiver of Bechtel's entitlement to a credit. The change notice does, however, contain an explicit, typed statement that "[t]he subcontractor is required to review these documents and advise the Project Construction Manager, in writing, of any changes affecting the Subcontract schedule or cost." Further, the letter accompanying the change notice requests that revised cost proposals be submitted no later than November 24, 1980. These explicit requests render it impossible for us to find that the issuance of change notice 25–D is a "clear, unequivocal, and decisive" act amounting to a waiver of Bechtel's rights.

Similarly, we cannot find that the execution of amendment 38 is such a "clear, unequivocal, and decisive" act. Ragnar Benson and Bechtel executed amendment 38 sometime in early August 1980. While amendment 38 does provide for the treatment (cleaning) of tower number one shell construction joints, it is predicated on an agreement reached and assumptions made in March, 1980, long before Ragnar Benson even tested the retardant for use in cleaning the joints. Further, Ragnar Benson was informed both before and shortly after the amendment was signed that Bechtel would be seeking a credit for cost savings attributable to the use of the retardant. N.T. 631–632 and defendant's exhibit 81. Bechtel's Wybranski testified that the only reason amendment 38 was signed after it became apparent that Ragnar Benson was experiencing significant cost savings was that Bechtel did not want to further delay the payments provided for in the amendment. Finally, the amendment itself contains no language that could amount to a waiver of Bechtel's rights. While the clear terms of the amendment prohibit Ragnar Benson from seeking further compensation

for the joint cleaning work, there is not even an intimation that Bechtel agreed to or intended to agree to a waiver of its rights to a credit under amendment 7. Under these circumstances, we hold that Bechtel's acts did not clearly and unequivocally evidence an intent or purpose to surrender contractual rights. Bechtel did not waive its rights. Rather, it demonstrated a clear intent to pursue the claim against Ragnar Benson for a credit under amendment 7.

Although we hold that Bechtel is entitled to a credit pursuant to amendment 7 of the contract, we find it appropriate to also address Bechtel's second and alternate contractual claim pursuant to amendment 25. Amendment 25 provided compensation to Ragnar Benson in exchange for its agreement to "furnish all labor, materials, equipment, and supervision required to treat the horizontal construction joints in the cooling tower shell in accordance with Addendum 1 to Revision 3 of Specification 8031–M–9B." Defendant's exhibit 42. The promised compensation for the work required by the amendment was $552,358.00. This value was based on the following explicit assumptions. First, it was assumed that Ragnar Benson would utilize a work crew consisting of:

| 2 | — | Cement Masons |
| 3 | — | Laborers |
| 2 | — | Operating Engineers |
| 1 | — | Electrician |
| 1 | — | Foreman |
| 9 | — | TOTAL |

*Id.* The subcontractor was required to use "the smallest and least costly crew possible to effectively perform the work." *Id.* Second, the parties assumed that Ragnar Benson would not be required to "pay any overtime [or] shift-work premiums," shift differentials, or high time premium pay. Finally, the parties agreed that "[i]n the event the crew required to perform the work varies from that shown ... the cost of the work will be adjusted (either add or deduct) by a subsequent amendment." *Id.*

Bechtel argues that the terms of amendment 25 entitle it to an adjustment in the price paid Ragnar Benson because the use of the retardant enabled Ragner Benson to reduce its joint cleaning crew from nine members to five members. N.T. 238–39; Bowermaster Deposition at 170. Ragnar Benson does not dispute that it reduced its joint cleaning crew after it began using the retardant. It does argue, however, that amendment 25 by its terms, is simply inapplicable to the joint cleaning operation, and that amendment 38 "was a full and final settlement of any claim by either party based on the size of the crew used in relation to the scope of work under Amendment 25." Plaintiff's Requests for Findings of Fact and Conclusions of Law and Brief in Support Thereof at 31.

Ragnar Benson's argument that amendment 25 does not apply to the joint cleaning operation rests on a highly contrived interpretation of that amendment and of the specifications. First, Ragnar Benson argues that amendment 25, on its face, is clear and unambiguous: amendment 25 applies by its terms *only* to the shell joint *treatment* operation. Next, Ragnar Benson turns to the specifications governing its work for Bechtel and points out that the specification entitled "construction joint *treatment*" refers only to the placement of grout prior to the pouring of concrete. Defendant's exhibits 18 and 21. The specification governing the hydroblasting of the joints and the removal of laitance is entitled *"Cleaning* of Construction Joints." *Id.* The final step in Ragnar Benson's argument is that, because amendment 25 refers only to *treatment* of the construction joints, it must concern compensation for *only* the placement of the grout and not for removal of the laitance or "cleaning" of the joints. According to Ragnar Benson, the use of the retardant was pursuant to a *cleaning* specification, rather than a treatment specification, therefore any change caused by the use of the retardant would not affect the compensation outlined in amendment 25 for *treatment.*

While it is true that the specifications refer to the hydroblasting operation as "cleaning" the joints, and amendment 25

purports to compensate Ragnar Benson for "furnish[ing] all labor, materials, equipment, and supervision required to *treat* the horizontal construction joints in the cooling tower shell in accordance with addendum 1 to Revision 3 of Specification 8031–M–9B," the only activity called "treatment" in the specifications, according to Ragnar Benson, is the placement of the grout. Close inspection of addendum 1 to Revision 3 of Specification 8031–M–9B, however, reveals that the grout specification is numbered *5.2.3.* and is to be added to section *5.2* of Revision 3. Specification 5.2 of revision 3, however, is entitled "Cleaning of Construction Joints." In fact, the only section of Specification 8031–M–9B, Revision 3, that says anything about "Construction Joint Treatment" is section *5.3.* This section reads

> Concrete surfaces to receive new concrete shall be thoroughly cleaned to remove all loose material and excessive water. Such surfaces shall be moist as approved by the contractor. No grout coating shall be applied prior to the next placement.

Defendant's exhibit 21 at 19. Furthermore, the requirement for placement of grout found under section 5.2 was deleted on August 8, 1979, only a month after Amendment 25 was signed, and was not reinstated for the balance of cooling tower construction.

It is absurd to contend that the "treatment" of the joints referred to in amendment 25 is the same as the treatment outlined in specification 8031–M–9B, Revision 3. Common sense dictates that it would not be necessary to employ a nine person crew to simply ensure that the joints were free of loose material and excess water prior to the placement of the next layer of concrete. The existence in amendment 25 of the provision for a nine person crew and the existence of separate payment provisions for the work they were to perform indicates that the phrase "treat the horizontal construction joints" must encompass more than "treatment" of the joints as that term is defined in the specifications in force at the time amendment 25 was executed.

As demonstrated above, Ragnar Benson's approach of looking only to the face of the documents involved results in an absurd interpretation of amendment 25. While we are loathe to hold that amendment 25 is, in its entirely, ambiguous, we do believe that the phrase "treat the horizontal construction joints" is ambiguous when read in light of the specifications to which amendment 25 refers.

When faced with an ambiguity in a contract, a court must look to external indicia of the parties' intent to determine what the parties actually meant at the time of contracting. These external indicia include the "definitions given to words in specialized commercial and trade areas in which [the parties] deal," *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1013 (3d Cir.1980), and "the parties' linguistic reference [point]," id. at 1011, fn. 12. In the instant case, it is clear from a series of communications between the parties prior to entering into the agreement embodied in amendment 25 that the term "treatment", from the linguistic reference point of the parties, includes cleaning the joints by hydroblasting them to remove the laitance. *See* Defendant's exhibits 31 and 29, and footnote 2, *supra.* Ragnar Benson's argument that reduction of the crew size used to hydroblast the joints is irrelevant to amendment 25's cost reduction provisions, therefore, fails. Absent a waiver or a subsequent abrogation of the terms of amendment 25, Bechtel has a right to a cost reduction based on the reduction of the joint cleaning crew size.

Ragnar Benson argues that Bechtel has, in fact, waived its right under amendment 25 by signing amendment 38 and the March 20, 1980 Memorandum of Understanding upon which it was based. Defendants' exhibits 62 and 67. Ragnar Benson relies on the language of the Memorandum which states "BPC offers and RBI accepts the lump sum of $104,102.00 in full and final settlement for the scope of work described with Amendment No. 25 *irrespective of crew size,* overtime, premium pay, shift

differential, hightime pay." (emphasis supplied). This phrase does not, however, appear in the final version of amendment 38 that was executed by the parties in August, 1980. The final version simply reads, "[s]ubcontractor agrees that the arrangement set forth in this Amendment No. 38 fully compensates Subcontractor for the scope of work described herein and that no additional claim for compensation for any cause relating to this subject will be made in connection with this Subcontract." Defendant's exhibit 67.

The Pennsylvania Supreme Court has held that, "in the absence of an ambiguity, a written contract is held to express all negotiations and agreements made prior to and leading up to its execution; that is, the negotiations are presumed to be merged in the writing ..." *National Cash Register Co. v. Modern Transfer Co., Inc.,* 224 Pa. Super. 138, 143, 302 A.2d 486, 488 (1973), *citing, Waldman v. Shoemaker,* 367 Pa. 587, 80 A.2d 776 (1951). Further, the Pennsylvania Supreme Court "has upheld 'integration' or 'merger' clauses in contracts, and have [sic] refused to admit parol or *prior written agreements* where the language of the contract is clear and unambiguous." *Id.* 224 Pa.Super. at 144, 302 A.2d at 489, *citing In Appeal of Edwin J. Schoettle Co.,* 390 Pa. 365, 372, 134 A.2d 908, 912 (1957) (emphasis supplied).

We find that the language of amendment 38 concerning the effect of the amendment on the parties' future ability to claim additional compensation or credits because of a change in crew size to be crystal clear and unambiguous. The amendment simply bars the *subcontractor,* i.e., Ragnar Benson, from making any *additional* claim for compensation for any reason for cooling tower number one labor costs or for costs to treat cooling tower number one horizontal construction joints. It does not, either expressly or impliedly, bar Bechtel from making a claim for a credit in accordance with amendment 25's cost adjustment provision. Because the amendment is clear and unambiguous, the provisions of the Memorandum of Understanding are simply immaterial. The Memorandum is clearly, by its terms, not a final agreement between the parties. It contemplates the execution of a final agreement sometime in the future and clearly states that that agreement "will be of no effect unless and until fully approved by Philadelphia Electric Co. and ... fully executed by both BPC and RBI." Under Pennsylvania law, such a preliminary agreement is presumed to be merged in the final written agreement, and is inadmissible to prove the meaning of the final agreement where that final agreement is, as we find here, clear and unambiguous. Ragnar Benson's claim that Bechtel has waived its right to an adjustment under amendment 25, or that amendment 38 supercedes amendment 25, is therefore without merit.

Because we hold that Bechtel is entitled to a credit for cost savings incurred by Ragnar Benson's use of the retardant under amendment 7, and alternatively that Bechtel is entitled to a credit pursuant to the cost adjustment provisions of amendment 25, we need not address Bechtel's restitution theories. We will, instead, move directly to a determination of damages.

### B. Bechtel's Damages

Bechtel has succeeded in proving an entitlement to a credit based on the amount of money Ragnar Benson saved as a result of the use of the retardant. Bechtel is therefore entitled to damages to reflect the difference between the contract price agreed upon between the parties before the cost savings was experienced, and the value of the work actually performed. The best way to measure the value of the work actually performed is to measure the actual work cost to Ragnar Benson to perform this work, based upon the manhours expended, the cost of the equipment, and the cost of the material. Ragnar Benson expended 12,862 manhours of which approximately 2,000 manhours were overtime labor in cleaning the construction joints on tower number one. Defendant's exhibit

158;[4] N.T. 1086, 1088; Defendant's Request for Admissions 746 and 127, N.T. 733, 735–736. These hours, multiplied by the composite hourly rate for unit one, *see* defendant's exhibit 361 and N.T. 1084, and the mark-up for profit and overhead of 18% per hour results in an actual cost for labor of $271,399.12, exclusive of the "high time" premium paid to certain crafts for their work on the shell. With the "high time" premium payments added in, Ragnar Benson's total actual labor cost for unit one was $299,888.45. *See* defendant's exhibit 158.

On tower two, Ragnar Benson actually expended 6,379 manhours in cleaning the construction joints. N.T. 1090. These hours, multiplied by the composite hourly rate for unit 2, *see* defendant's exhibit 361, and the mark-up for overhead and profit results in a labor cost of $135,715.77. This cost, plus high time in the amount of $14,-129.49 yields a total actual labor cost for unit two of $149,845.26. *See* defendant's exhibit 158.

Ragnar Benson's equipment cost, including the 10% mark-up allowed under the contract was $84,680.64. N.T. 1098. The material cost of the retardant, plus allowed mark-up amounted to $8,226.41. N.T. 1098–1099. The total out-of-pocket expenses to Ragnar Benson for joint cleaning work amounted to $542,640.76, calculated as follows:

Tower One

| | | |
|---|---|---|
| 12,862 manhours × $15.80 composite hourly rate, Unit 1 × 1.18 mark-up | = | $239,799.12 |
| 2,000 hours estimated overtime × $15.80 overtime premium | = | 31,600.00 |
| | | $271,399.12 |
| 12,862 × $2.215 hightime premium | = | 28,489.33 |
| Total actual labor cost, tower one | = | $299,888.45 |

Tower Two

| | | |
|---|---|---|
| 6,379 manhours × $18.03 composite hourly rate, Unit 2 × 1.18 mark-up | = | $135,715.77 |
| 6,379 × $2.215 hightime premium | = | 14,129.49 |
| Total actual labor cost, tower two | = | $149,845.26 |

**4.** Plaintiff objects to the use of Defendants' exhibits 158 and 159 because it claims that it had no notice of this theory of recovery. We ruled at trial, and we reiterate this ruling now, that

Equipment

| | | |
|---|---|---|
| $76,982.40 × 1.10 (mark-up) | = | 84,680.64 |

Material

| | | |
|---|---|---|
| $7,478.55 cost of retardant × 1.10 | = | 8,226.41 |
| Total Out-of-Pocket | = | $542,640.76 |

*See* Defendant's exhibits 158 and 159, N.T. 1082–1099.

This total actual cost to Ragnar Benson must now be deducted from the actual contract price to arrive at the amount of cost-savings experienced and due Bechtel. We find that the best measure of the actual contract price for the joint cleaning work is the amount actually paid by Bechtel to Ragnar Benson. This is true because through the completion of the project, Ragnar Benson invoiced for the shell joint cleaning work and Bechtel paid those invoices according to the price terms of the contract as if there had been no cost savings attributable to use of the retardant. The total amount paid by Bechtel, excluding the high time premium, was $750,-323.00. *See* N.T. 1092–1093, defendant's exhibit 159. This amount included payments for cost of equipment and material. The total amount paid for high time, for both towers, was $68,518.81. Defendant's exhibit 159, N.T. 1093–1094. The total amount paid for joint cleaning work totalled $818,841.81.

■ The amount of credit due Bechtel, therefore is $276,201.05, determined as follows:

| | |
|---|---|
| $818,841.81 | total paid to Ragnar Benson (contract price) |
| −542,640.76 | total out-of-pocket cost to Ragnar Benson |
| $276,201.05 | cost-savings due Bechtel |

## C. *Ragnar Benson's Claims*

Ragnar Benson makes two additional claims for damages, in addition to its first claim for payment of the amount withheld by Bechtel. The first claim is that Ragnar Benson should be compensated for 29,213 manhours in excess of the manhours for which it was paid to construct the unit one

these exhibits are not based on a new theory and are consistent with the theories set out in defendant's pretrial and trial briefs.

cooling tower shell. Ragnar Benson claims that these excess manhours were necessitated by a loss of labor productivity experienced in other operations on the shell and caused by the interference of the hydroblasting operation with these other operations. Ragnar Benson makes this claim under amendment 7's "change" provisions.

■ Ragnar Benson's first claim fails because it cannot point to a change for which amendment 7 would authorize compensation, and which has not already been the subject of an agreement between the parties. Ragnar Benson argues that the change that triggers the provisions of amendment 7 is the change from the wire brush method of preparing the joints to the hydroblasting method. This change, however, was the subject of at least two contract amendments that increased the compensation due Ragnar Benson for its joint cleaning work. The first amendment was amendment 25. Amendment 25 by its terms compensated Ragnar Benson for "furnish[ing] all labor, material, equipment and supervision required to treat the cooling tower shell horizontal construction joints...." Amendment 38 went beyond amendment 25, increasing the compensation for cleaning the joints, but also compensating Ragnar Benson for "additional Cooling Tower No. 1 shell labor costs." In a key provision of amendment 38, Ragnar Benson agreed "that the arrangement set forth in this Amendment No. 38 fully compensates Subcontractor for the scope of work described herein and that no additional claim for compensation for *any cause* relating to this subject will be made in connection with this Subcontract." Defendant's exhibit 67 (emphasis supplied).

The word "arrangement" in the foregoing provision clearly and unequivocally refers to the incentive payment schedule outlined in the foregoing paragraphs. The "scope of work" referred to is defined equally clearly on the first page of the amendment as "Cooling Tower No. 1 shell labor," and treatment of the horizontal construction joints. Therefore, we hold that, by the clear and unequivocal terms of amendment 38, Ragnar Benson is barred from asserting a claim for compensation for additional manhours for shell number one construction. Ragnar Benson waived all rights to such a claim when it bargained for the extra compensation in amendment 38 and, in exchange, signed the express agreement not to seek additional compensation for cooling tower number one shell labor costs.

Ragnar Benson's second claim is a similar claim to the first, but this one is for extra compensation for the shell joint cleaning operation itself. The express terms of amendment 38 also bar this claim, and for the same reasons. Ragnar Benson explicitly and unequivocally agreed "that no additional claim for compensation for any cause relating to this subject will be made in connection with this Subcontract." Defendant's exhibit 67. The term "this subject" clearly refers to compensation for the joint cleaning and treating operation, as well as to compensation for additional shell labor costs.

### D. *The Retention Claim*

■ Bechtel retained the sum of $182,-932.45 pursuant to paragraph 24 of the General Terms and Conditions of the subcontract with Ragnar Benson as payment toward its claim for a credit which was discussed in detail above. *See* Defendant's exhibit 7. We conclude that, pursuant to the language of the contract and in light of our holding in Bechtel's favor, this sum was properly retained. It will be applied against the amount found owing to Bechtel on its claim for a credit.

### IV. CONCLUSIONS OF LAW

In view of our findings of fact detailed above, and in light of the above discussion of these facts, we make the following conclusions of law.

1. This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332.

2. Pennsylvania substantive law applies in this case.

3. Bechtel is entitled to a credit in the amount of $276,201.05, pursuant to amendments 7 and 25 of the subcontract between Bechtel and Ragnar Benson.

4. Ragnar Benson is barred from asserting its shell manhour and shell joint claims by the clear and unambiguous terms of amendment 38.

5. Bechtel's retention of $182,932.45 shall be applied against the amount found owing to Bechtel on its claim for a credit.

6. Under Pennsylvania law, Bechtel is entitled to prejudgment interest at the legal rate of 6% simple interest per annum on the amount of $93,268.60, the difference between the amount awarded by the court on its claim and the amount retained by Bechtel. Prejudgment interest has been accruing since September of 1982, the time when tower number two was completed and the time when the cost savings realized by Ragnar Benson could have first been determined with reasonable certainty.